REID, Judge.
This is a suit brought by Martin A. Cannon to set aside a mineral deed executed in favor of defendant, H. Y. Hunt. The record discloses that on August 30, 1958, H. Y. Hunt, a Shreveport businessman, employed G. A. Lindsey to purchase certain mineral interests in the Parish of Ascension. Mr. Lindsey called on plaintiff, Mr. Cannon, and after some negotiation the plaintiff executed a mineral deed in favor of Mr. Hunt conveying an undivided one-half interest in and to all minerals owned by plaintiff in a certain tract of land containing approximately 58 acres, situated in the Parish of Ascension, Louisiana, for a consideration of $2700.00.
Shortly after the transaction took place, the plaintiff and various members of his family became dissatisfied with the transaction, and on Tuesday September 2, 1958 Mr. Cannon and some of his children contacted Mr. Plunt in an effort to cancel the *524 mineral sale. After checking' with his agent and being informed the agent had actually purchased one-half of the mineral interest for $2700.00, Mr. Hunt proceeded to record his deed.
Plaintiff alleged the deed should be annulled because (1) there was no meeting of the minds, (2) plaintiff signed the deed under the mistaken impression the deed was a sale of royalty and discovered the mistake when the rental payments under his existing lease were reduced, (3) lesion beyond moiety, and (4) plaintiff was blind and the deed was signed by two witnesses instead of three. Plaintiff abandoned the allegation of lesion beyond moiety and this is not at issue herein. Defendant on the other hand contended the deed in question was signed by Mr. Cannon in the presence of his daughter and both Mr. Cannon and his daughter were fully cognizant of the terms and conditions.
The defendant filed a general denial and exception of no cause or right of action. The exception was, by consent of counsel, referred to the merits.
On September 11, 1963, for written reasons assigned, judgment was rendered in favor of plaintiff and against defendant decreeing the deed in question null and void and ordering its inscription cancelled from the records of Ascension Parish. From the judgment the defendant has entered this appeal. Subsequent to entering this appeal plaintiff died and his widow and children were substituted as parties plaintiff herein.
The Trial Judge found that defendant’s agent had exceeded his authority in purchasing one-half of the minerals under a .58 acre tract for $2700.00 rather than $50.00 an acre for a full mineral interest as authorized by the defendant, and, therefore, the third party, the plaintiff, was relieved of his obligation towards the principal whose agent had exceeded the authority granted him, for as long as the principal could repudiate the acts of his agent the third party could signify his dissent. The Court found there had been no ratification by the principal prior to the time plaintiff had indicated his intention to withdraw. The Trial Court did not pass upon the issues raised by plaintiff in his petition, but based its opinion on evidence brought out on the trial of the case.
Defendant alleged five specifications of error: (1) In holding the defendant’s agent had exceeded his authority when the record conclusively shows that the agent had specific authority to pay the price paid, (2) in holding ratification was necessary in view of the specific authority given the agent, (3) in failing to hold that if ratification was necessary, which was denied, the agent’s acts were ratified prior to any attempt on the part of plaintiff to cancel the contract, (4) by basing its decision on issues not raised by plaintiff in his pleadings, and (5) by failing to hold that the mineral purchase by defendant from plaintiff was valid and binding as between the parties.
The principal points discussed in this opinion will be the Trial Court’s holding as to whether or not the contract was null and void due to the agent exceeding his authority, and the issues of error, misrepresentation and fraud raised by the plaintiff.
The Trial Court stated in its reasons for judgment:
“There is no doubt that Hunt, as the principal, commissioned Lindsey, his agent, with authority to purchase minerals from Cannon, the third party, on an acreage basis not to exceed $50.00 an acre for a full mineral acre. The evidence further shows without doubt that the agent exceeded this authority in purchasing one-half of the minerals under a 58 acre tract for $2700.00. The facts further reveal that the principal was not aware of the basis of this purchase until after the third party had made demand upon him to rescind the contract.”
*525 The Trial Court based this opinion upon the following testimony quoted in its reasons for judgment:
“Transcript of testimony, Mr. H. Y. Hunt, page 2:
“Q: Mr. Hunt, on the occasion of on or about August 30, 1958, had Mr. Lindsey been in your employ then or commissioned by you to do any work in Ascension Parish?
“A: I called Mr. Lindsey and asked him to come to Ascension Parish to do this work for me.
“Q: Did you give him any special instructions ?
“A: Well, I told him to try to buy minerals at Fifty Dollars an acre if he could.
Thoses were your instructions to him to purchase at Fifty Dollars an acre? ■ ÍÓ
“A: Yes.
“Transcript of testimony, Mr. H. Y. Hunt, page 55:
“Q: What did you tell him (Grady A. Lindsey) to buy for you?
“A: I told him to buy mineral rights.
“Q: Did you give him the general area where he should buy?
“A: I gave him the location of the well that was drilling at that time and told him to stay within a half or three-quarters of a mile of the well if he could.
“Q: Now, did jmu give any instructions as to price?
“A: I told him to try to buy the minerals at Fifty Dollars.
“Q: That means fifty dollars for a full mineral acre?
“A: For a full mineral acre.
Q: He left you under those circumstances, did he not?
“A: That’s correct.
“Q: When did you next hear from Mr. Lindsey?
“A: About 10:30 that night, Friday night.
“Q: Did he give you any report on what he had done?
“A: Yes, sir, he reported that he had bought the mineral rights under one tract and had paid Twenty-Seven Hundred Dollars for half of the mineral rights.
“Q: Do you recall, Mr. Hunt, what tract that was?
“A: That was J. E. Anderson.
“Transcript of testimony, Mr. Grady A. Lindsey, page 90:
“Q: How much did you offer him (Mr. Wallace, another prospect) and he refused?
“A: I offered him fifty dollars. That was what I was authorized to pay.”
However, an examination of the entire testimony of both Mr. Hunt and Mr. Lindsey will show that while Mr. Hunt had instructed Mr. Lindsey to try to purchase minerals at not more than $50.00 an acre, Mr. Lindsey did contact Mr. Hunt the night before he obtained the mineral deed in question and informed him that he could not purchase minerals in the desired area for $50.00 an acre, that he had purchased a one-half mineral interest in 57 acres from Mr. J. E. Anderson for $2700.00 and, according to the testimony of Mr. Hunt, Mr. Lindsey was informed that if he could make the same deal with Mr. Cannon to proceed with the purchase. Mr. Hunt testified as follows:
“Q: Did Mr. Lindsey report to you only of the successful purchases *526 or did he report to you any unsuccessful approaches to other parties in the area?
“A: Well, I believe that he, no one specifically, his report to me was that he couldn’t buy at Fifty Dollars.
“Q : Now, as to persons: did he say that he had approached other persons other than in addition to the ones from whom he did purchase ?
“A: Well, determining that he could-n’t buy at Fifty Dollars he would have had to contact some persons. Those persons I am not aware of who they might have been.
* * * * * *
“Q: What did you tell him to buy for you?
“A: I told him to buy mineral rights.
“Q: Did you give him the general area where he should buy?
“A: I gave him the location of the well that was drilling at that time and told him to stay within a half or three-quarters of a mile of the well if he could.
“Q: Now, did you give any instructions as to price?
“A: I told him to try to buy the minerals at fifty dollars.
“Q: That means fifty dollars for a full mineral acre?
“A: For a full mineral acre.
* * * * * *
“A: Yes sir, he reported that he had bought the mineral rights under one tract and had paid Twenty-Seven Hundred Dollars for half of the mineral rights.
“Q: Do you recall, Mr. Hunt, what tract that was ?
“A: That was J. E. Anderson.
COURT: He had paid Twenty-Seven Hundred Dollars for what, Mr. Hunt?
“A: One-half of his mineral rights.
* * * * * *
“Q: Did you give Mr. Lindsey any further instructions when he called you on the night of August 29, 1958?
“A: Well, Mr. Lindsey told me over the telephone that he had an appointment to see the Cannons the next morning early and I told him if he could buy mineral rights at somewhat the same figure as he bought the J. E. Anderson but if he couldn’t buy mineral rights and had to pay that price just to leave out there I wouldn’t be interested.
“Q: Now, would you say again what he told you with reference to the appointment with the Cannons to talk about the purchase of their minerals?
“A: He told me that he had called these people and had an appointment with them for about six o’clock the next morning.
“Q: And he told you that over the telephone on the night of the 29th?
“A: About 10:30 on the night of the 29th. I was in New Orleans.
* * * * * *
“Q: Mr. Hunt, where did Mr. Lindsey call you from on August 29th at 10:30?
“A: He was at the Bellemont Courts in Baton Rouge.
“Q: Exactly what report did he make to you of his activities ?
“A: He made the report to me that he had purchased one-half min- *527 erais from J. E. Anderson for Twenty-Seven Hundred Dollars and that he had an appointment for 6:00 the next morning with the Cannons.
“Q: That was the extent of his report to you that night?
“A: Yes mam.
* * * * * *
"Q: Did Mr. Lindsey tell you how many acres were in the Anderson tract?
“A: Yes, he mentioned that it contained fifty-seven acres to my recollection.
* * * * * *
"Q: Did you instruct Mr. Lindsey to then purchase other minerals for you in the area?
“A: I told him so long as he could buy other minerals at that same price to go ahead and buy two or three more tracts. If he had to go beyond that price to just let it go.
* * * * * *
It is thus clear from the testimony of Mr. Hunt that he was aware of Mr. Lindsey’s purchase of the one-half interest in 57 acres from a Mr. J. E. Anderson and he had informed Mr. Lindsey the night before he met the plaintiff that he was authorized to make the same deal with plaintiff. The record shows the defendant also purchased a one-half mineral interest from a Mrs. Effie V. Anderson, who had approximately the same acreage, for the same consideration.
It is the opinion of this Court that the evidence discloses Mr. Lindsey did not exceed the authority of his principal. The Trial Court was in error in taking a portion of the testimony out of context and basing its decision on that point. We are not here dealing with a conflict in testimony hut, on the contrary, are dealing with uncontra-dicted testimony of the principal and agent
Since we hold the agent did not exceed his authority, there is no need for this Court to go into the question of ratification.
Plaintiff contends that the deed should he upset due to mistake, error, misrepresentation and undue influence. Counsel for plaintiff argues that both plaintiff and his wife were elderly people, the plaintiff was almost blind and deaf, and early one morning, at approximately ó :00 A.M., the agent of defendant came to plaintiff’s house and through high pressure methods induced him to sign away one-half of his minerals for $2700.00 when the plaintiff was under the impression he was signing a royalty deed for a stipulated price $100.00 an acre or $5800.00. Plaintiff and his wife testified that neither of them read the instrument, and they did not know the amount of money offered until their daughter came from next door to witness the deed. The daughter testified when she was called she thought one of her parents must be ill and because she was excited she did not read the deed when it was presented to her and was unable to read the draft because she did not have her glasses. Needless to say, the testimony of the agent is directly contradictory to the testimony of plaintiff. Mr. Lindsey testified he explained the entire situation t' plaintiff, the deed was available to be read by the plaintiff and his witnesses, and at no time was there an agreement to purchase the minerals on the basis of $100.00 per acre or $5800.00. There is conflict of testimony as to whether or not Mr. Lindsey, the agent, had called the plaintiff on the night before or whether he came unannounced early in the morning. There is also conflict of testimony as to whether or not the acreage was discussed.
The following information, however, is undisputed and relevant. Plaintiff did sign the instrument, there being no question as to the genuineness of the signature. Plaintiff’s daughter did witness the instrument, and the instrument was available for her to read if she so desired. There is no evidence in the record indicating plaintiff’s daughter, his wife, or plaintiff himself were *528 prevented from reading the instrument. While the evidence shows the plaintiff did not sfee well, it is inconclusive as to whether or not he was blind.
Plaintiff’s deposition was offered by consent of counsel in lieu of cross-examination. He admitted in his deposition that at no time in his discussion with the agent was there any discussion of acreage; that he was not asked what acreage he owned and he did not volunteer the information. Mr. Lindsey testified he informed the plaintiff of his purchase of the J. E. Anderson minerals for $2700.00 and he wanted to purchase plaintiff’s minerals for the same figure. In support of Mr. Lindsey’s testimony is the testimony of plaintiff’s wife:
“Q: Well, you were interested also in the $2,700.00 that Mr. Lindsey was offering for half interest in the minerals, too, weren’t you ?
“A: Well, when I seen he was going to take that, there was nothing for me to do.
“Q: In other words, when you saw that your husband was going to take the $2,700.00 for a half interest in his minerals you figured there wasn’t anything else for you to do?
“A: That’s right. There wasn’t anything — I didn’t know what to do.”
A fact brought out on the trial and not mentioned by the Trial Judge, but relied upon heavily by the defendant, is the roll the children of plaintiff played in this matter. The record is clear that, upon learning of the sale plaintiff’s children were most displeased with their father for making the sale and were most insistent that he attempt to set it aside. This action was apparently brought about when shortly after Mr. Lindsey completed the transaction, other prospective buyers approached plaintiff and offered a better price for the mineral interest. Mr. Cannon testified in this regard as follows
“Q: I see. I believe that’s all Miss Attaya.
“A: There is something I would have like to have told you but you didn’t ask me.
“Q: All right, go right ahead.
“A: You asked me about the others coming to see me that — about those mineral rights. You never asked me how they offered the price or nothing else. But there was a man by the name of Hymel from up here or somewhere down there and he told me he wanted to buy it for a man by the name of Hunt who was an oil man or banker, I believe, in Lafayette. And he offered me $11,000.00 an acre for it.
“Q: He offered you $11,000.00 an acre?
“A: $11,000.00 for that half interest that the other man had and he told me, he said, ‘I’ll give you— make a check for $11,000.00 and you make an agreement that if I can get that agreement back from —that you made to this other fellow — if I can get it back, it will be mine and you will have the $11,000.00.’ And I wouldn’t do it because I was already tied up in a mess then that I didn’t know how I was going to get out of. But that fellow was named Hymel and he was from Lafayette and he was representing a man, so he said, by the name of Hunt or Hunter — -I wouldn’t say — it was Hunter maybe — he was a banker. I know that’s what he said he was, that Hunter was a banker in Lafayette — that same day.
* * * * * *
“Q: And that’s what caused you to try to attack this mineral deed *529 that you executed when Mr. Lindsey was there, isn’t that right ?
“A: That’s part of it.
“Q: That’s part of it ?
“A: Not Mr. Hymel wasn’t the first one. There was somebody ahead of him. Oh, there was — I don’t know how many come that day, but the first one come early. I reckon it was 9:00 o’clock in the morning, something like that, and he offered me $9,000.00 and then he went up to $11,000.00
“Q: Do you remember his name ?
“A: No sir, I don’t.
“Q: Now, in other words, these several persons coming to you after Mr. Lindsey was there that day, were the cause of your bringing this suit, trying to set this mineral deed aside?
“A: Yes sir.
“Q: And that was the sole reason ?
“A: My children come, some of them as soon as they heard it, they knowed that it wasn’t right and so on, but anyhow they — some of them come around that morning and they went down that same day before the fellow, Hymel, and some of them others, but some of them had got — one of them, I know had come, the first one I was telling you about — but they went down to Gonzales and down to Acy and all around about there, but the same day they went down there and saw Miss Attaya. That same day they went down and contacted her before anything else was done or anything. That was the first thing they done and then on a Tuesday after-wards, I went to Donaldsonville with a couple of my son-in-laws 165 So.2d — 34 to try to keep from having it— what do you call it — registered.
“Q: In other words, your children and your sons-in-law got you to go to the attorney to try to set this mineral deed aside because of the fact that these other people had come there later and offered you more money, is that right?
“A: Well, sure. They knowed it as soon as they heard it, they wasn’t satisfied. They knowed I hadn’t gotten enough. They raised sand with me for doing it, because I hadn’t talked to them about it. I never had thought about it, hadn’t heard nothing about such a thing. I told Mr. Lindsey that. I said, T don’t know nothing about such things.’ And that’s when he told me he was going to give me such a big price.
“Q: At the time you executed the mineral deed to Mr. Lindsey, it was your intention to sell him half interest in your minerals at that time, was it not?
“A: Yeah.
“Q: Is that right?
“A: That’s what I agreed to.”
This is substantiated by the testimony of Mrs. Cannon:
“Q: And the sole reason the complaint was made about this instrument was that the children and your sons-in-law complained about what Mr. Cannon had done, isn’t that right?
“A: Yes sir.”
After reviewing all of the testimony this Court is compelled to believe that the real motivation behind plaintiff’s action in seeking to annul the mineral sale was not fraud, misrepresentation or undue influence, but was merely an awareness on *530 the part of plaintiff’s children that their father had made an unprofitable agreement and, while it is true that plaintiff’s age and physical condition may have been a contributing factor to agreeing to the lease that factor in itself would not constitute fraud and misrepresentation such as would enable him to set aside the sale.
It is the opinion of this Court that the case at bar fits the test set forth in Snell v. Union Sawmill Company et al., 159 La. 604, 105 So. 728, at page 730 (1925), wherein the Court said:
“The evidence does not support the charge of fraud and misrepresentation; the trial judge did not believe it, nor do we. It would serve no good purpose to review the evidence in the record, but it suffices to observe in the emphatic language of this court in Boullt v. Sarpy, 30 La.Ann. 494, 495, that ‘signatures to obligations are not mere ornaments.’
“If a party can read, it behooves him to examine an instrument before signing it; and if he cannot read, it behooves him to have the instrument read to him and listen attentively whilst this is being done. Murphy v. Hussey, 117 La. 390, 399, 41 So. 692; Baker v. Myatt, Dicks Motor Co., 12 Orleans App. 281.”
The case of Bennett v. Robinson, La.App., 25 So.2d 641, is also factually similar to this case. In that case, there was an attempt to annul a sale of mineral interest on the ground that only a sale of royalty was intended. Plaintiff’s wife, the notary who passed the act and a witness to the act all testified to that fact. Nevertheless, in dismissing plaintiff’s suit, the Court discussed the question of fraud and misrepresentation at great length and held as follows:
“This case tenders for solution a question not new in the jurisprudence of this state. A question of fact only is involved. If we were bound to determine the issue from the number of witnesses who testified for plaintiff, perforce judgment would go for him, but in solving such a question the number of witnesses for or against a litigant need not necessarily be controlling. The written instrument, as evidence, goes far toward sustaining its own efficacy. This evidence, aided and supported by defendant’s own testimony, and attending facts and circumstances, warrants application to the facts of this case the rules of evidence announced in the following cases:
“Franks v. Davis Bros. Lumber Co., Ltd., 146 La. 803, 809, 84 So. 101, 103 wherein it was held:
“ ‘To say the least, we do not think that he has established the alleged fraud and misrepresentation to such an extent as to relieve himself from the effect of having signed the deed without reading it, even granting that he did so. In the absence of a reasonably strong showing of fraud or error, the document which the parties signed will be presumed to constitute the agreement between them. Watson v. Planters’ Bank, 22 La.Ann. 14; Allen, West & Bush v. Whetstone, 35 La.Ann. 846.’
“Rodgers v. S. H. Bolinger Co., Ltd., 149 La. 545, 89 So. 688, in which it was said and held, in discussing fraud and error in written contracts, that: ‘Equity may reform even contracts unambiguous in their terms, on clear proof that, through fraud or error, the written instrument has been made to express a different purpose from that which the parties had agreed on and had intended to embody therein; but, to support such relief, there must be clear proof of the antecedent contract and of the error in reducing it to writing.’
“In Belcher v. Booth et al, 164 La. 514, 520, 114 So. 116, 118, the court discussing the character of proof necessary to sustain allegations of fraud, went further than it had in any case *531 prior to that time or since, so far as we can learn. It said:
“ 'We think that fraud should he proven to that degree of certainty which warrants the conviction of a person who is charged with the commission of a crime, i. e., beyond a reasonable doubt.’
“Fraud is never presumed. The opposite, that is, that all persons are presumed to be honest and to deal honestly with their fellowmen is the rule. Concerning the proof necessary to sustain an allegation of fraud, Civil Code, Article 1848, says:
“ ‘The maxim that fraud is not to be presumed, means no more than that it is not to be imputed without legal evience.’
“Undisputed facts support the contention that defendant made no effort to conceal from plaintiff, the notary, nor from the attesting witnesses, the true character of the instrument assailed. He tendered it to plaintiff for reading and if he did not read it, surely he can blame only himself for not doing so.
* * * * * *
“Failure to read an instrument or to have it read so that knowledge of all of its recitals may be acquired by those who sign it, does not of itself provide grounds for escape from its legal effect as an obligation. The character of the sale was definitely brought to plaintiff’s attention by what was written on the face of the check representing the price. He admits that he then knew the difference in legal effect between a sale of royalty and a sale of mineral rights.
“Plaintiff’s action is based upon alleged error on his part in signing the sale to defendant, superinduced by defendant’s misrepresentation and fraud. It goes without saying that the burden rested upon him to support the predicate of his case by evidence of a convincing character. If this were not the rule in a case of this kind, confidence in and reliance upon written instruments would be materially reduced. Their probative worth would be unstable, and they would not provide that degree of security so necessary in business transactions.”
See also Sanders v. Sanders, 222 La. 233, 62 So.2d 284, wherein the Court stated that evidence showing probably fraud or circumstances partaking of a suspicious character were not sufficient to prove fraud ; fraud must be established by proof stronger than the mere preponderance of the evidence.
In the case at issue, while it might be said that neither plaintiff nor his wife were fully aware of their actions and did not and could not read the mineral deed, and even if it could be assumed, which is unlikely, that the plaintiff’s daughter who witnessed the instrument, merely signed the deed at the request of a stranger without inquiring into the action, nevertheless, there was nothing to prevent the plaintiff from having the deed read to him, nor is there any evidence in the record which would indicate that the defendant’s agent either fraudulently or by undue influence prevented any of the parties from obtaining full disclosure of the contents of the instrument.
It is thus the opinion of this Court that the plaintiff has failed to show by preponderance of the evidence that fraud or misrepresentation was committed upon him.
For the foregoing reasons the judgment of the Lower Court is reversed and judgment rendered rejecting plaintiff’s demands and dismissing his suit at his costs.
Reversed and rendered.