MONROE, J.
Plaintiff claims $2,500 as for a total loss under a policy of fire insurance issued by defendant. After filing an exception, which was overruled, the defendant answered, in substance, as follows: It admits the issuance of the policy sued on, by which it insured the plaintiff against loss or damage by fire .on' household furniture and other property in the premises described. It also admits that a fire occurred, within the life of the policy, by which the property insured was partially destroyed or damaged, and that it received from plaintiff a statement, sworn to by him, purporting to be a proof of loss, which it annexes to its answer. It avers that the premises described in the policy were warranted to be a private dwelling, but were otherwise occupied; that the policy contains the following clauses, to wit:
“This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused, and shall, in no event, exceed what it would then cost to repair or replace the same with material of like kind and quality. * * * This policy shall be void if the assured has concealed, or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance, or the subject thereof; or if the interest of the insured be not truly stated herein; or in case of any fraud or false swearing of the insured touching any matter relating to this insurance, or the subject thereof, whether before or after loss * * *, or, if the interest of the insured be other than unconditional ownership,” —And that the plaintiff, in violation of these stipulations, concealed material facts concerning the property insured, and falsely and fraudulently misrepresented the sound value thereof and the damages thereto; that he fraudulently removed a portion of said property without notice to defendant, and makes claim for loss on the property so removed, as also on property which did not belong to him; and that his sworn proof of loss, and the schedule annexed thereto, were false, fraudulent, and fictitious. It further alleges a tender of the premiums received, and refusal of the plaintiff to accept the same. ' There was judgment rejecting plaintiff’s demand, and he has appealed. The policy is for $2,500, on household and kitchen furniture and other articles, such as musical instruments, paintings, bric-a-brac, etc., “while contained in the double one-story slate-roofed frame building, occupied as a private dwelling, only, No. 2104 St. Peter street, in New Orleans,” and it contains the stipulations as set forth by the defendant. The plaintiff at the date of the trial, in March, 1902, was 28 years of age, had been married for nearly S years, and had one child, about 5 years old. It does not appear that he had any resources other than his earnings as a clerk and cabinetmaker, and he testifies that he had worked as a clerk for the Armour Packing Company for four years, but had left that concern about two years before the date at which he testified, or, say, in March, 1900, and had afterwards been employed by Levy & Aaron, dealers in new and secondhand furniture, at a salary of $12 a week, to which were added commissions on sales, bringing his total earnings up to an average of $15 or $16 a week; his testimony, as a whole, making it reasonably certain that he had never earned more than, if as much as, $75 a month. Some time in 1900 he moved into the home in which he was living when the fire occurred, being the one side of a double tenement one-story cottage, and consisting of four rooms, viz., a front room or parlor, measuring 12x13.5; a bedroom immediately behind, and of the same size as, the parlor; a dining room behind the bedroom, measuring 11.6x13.9; and a kitchen behind, and of the same size as, the dining room.
Por this house, which was situated in a neighborhood inhabited by poor people, the plaintiff paid $10 a month rent. In April, *887 1901, his wife being sick, he sent her and his child across the lake, where he paid $10 a week for their support. In May following, according to their testimony, one Berges, who was employed by the defendant as a solicitor, suggested that plaintiff should insure his furniture, but the plaintiff demurred; saying that, his wife being sick, he needed all of his money, and that he did not feel able to pay the premium. He was finally prevailed upon, however, and, Berges having looked at the property and having fixed the amount, the policy was issued on May 14, 1901, for $2,500, and the premium, $12.50, was paid about 15 days afterwards. The plaintiff states that on the evening of the fire he had left his house about half past 6 o’clock, and had gone to a club, where he was engaged in playing cards with some of his friends, and that, whilst so engaged, between 11 and 12 o’clock that night, he was called by a boy named Barbier, who lived at the house of his mother-in-law, and was told that his residence was on fire, and that he went to the scene of the fire and fainted. He further states that the next morning a man named Mangson, with whom it does not appear that he had any previous acquaintance, introduced himself as an adjuster, though not pretending to represent the defendant, and said to him: “I know you are all right. I will fix your loss and have it adjusted in sixty days” —and that he and Mangson then made up the proof of loss, with the schedule annexed, which was subsequently presented to the defendant. The schedule foots up $3,241.66 as the value of the furniture, paintings, brica-brac, statuary, wearing apparel, etc., contained in his house, and covered by the policy here sued on, which, in the proof presented to the defendant, he swore was a total loss; stating in his affidavit that no property saved had been in any manner concealed, and that no attempt had been made to deceive the defendant’as to the amount of said loss. The plaintiff, explaining how this schedule had been made up, further states that when the policy was issued, to wit, May 14, 1901, he was told by Berges, the solicitor, that he had better make an inventory, in order to be able to prove his loss in the event of a fire, and that he and his wife thereupon went through their house, from one room to another, and made a detailed- inventory of its contents, appraising each article at its cost price. We make the following excerpt from his testimony on this subject:
“Q. What time did you begin to do it, about?” (Referring to the making of the inventory.) “A. Well, after I was told that I would have to make proof of loss, the same as a store would have kept books, I said to my wife, ‘We have got a policy, and, if anything was to occur, this policy is not good, unless you know what was in the house. ■ We have to do the same as if taking stock in the store.’ Q. And you took stock? A. Yes, sir. * * * Q. Who made this book?” (Referring to the inventory.) “A. Myself. My wife called off some things, and I would look at it and put it down the same as taking stock. Q. Your wife called it off to you? A. Yes, sir; how much would this and that cost. Q. Say, for instance, you took this book and went to the first room, twenty-six yards of matting. You and your wife agreed that there were twenty-six yards? A. Yes, sir. Q. And you put down what you paid for it? A. Yes, sir. Q. Then you came to two Smyrna rugs. Your wife called that off? A. I looked at it myself. We would go along, and we looked at the stuff, which cost so much. That would he what it cost — two rugs $6 apiece. That would be $12. Q. You did all the writing? A. Yes, sir. Q. Whatever was called out, she called out? A. We looked at it. We went over it together. Q. How many days did it take you to make an inventory in the first room? A. I don’t know. We would work two or three hours after supper. We didn’t finish the first room in two or three hours. We may have started on a Monday, and I think on Sunday we worked four or five hours. I think it took about twelve to fourteen hours altogether. Q. You went from one room to the other? A. Yes, sir. Q. You and your wife? A. Yes, sir. Q. And you did that at the time you got your policy? A. Yes, sir.”
The peculiarity about this is that the plaintiff also testifies most positively and circumstantially that his wife and child went over the lake in April, before the policy was taken out, and did not return to the city until some time in July, ¿ month after the fire, and there is no attempt to reconcile the contradiction.
Among the articles included in the inven *889 tory, the making of which is thus described, is a piano, for which the plaintiff swears that he paid one Isaac Levy $300 on the 24th of May, 1901, and he produces a bill purporting to have been made out and receipted by Isaac Levy as of that date. Isaac Levy is, however, not produced; and it will be remembered that it was about that time that, according to his testimony, the plaintiff needed all of his money for his sick wife, and was obliged to avail himself of a delay of 15 days in the matter of the payment of the premium, amounting to $12.50, on the insurance which he had just taken out. Another marked peculiarity about the piano is that it is said to have been purchased May 24, 1901, and • yet it figures on the inventory which the plaintiff swears he made a week before of the effects then in his house. And finally, upon that subject, Mr. Uthoff, who appears to be qualified to judge of such matters, valued the piano, judging from the name plate, frame, and part of the front, which were not consumed, at $40.
Other articles included in the inventory, and said to have been purchased from plaintiff’s brother, who keeps a secondhand furniture or “antique” store, are as follows:
On June 3, 1899:
One large oil painting, scene, “Battle of Paris” ....... .............. $ 75 00
Oil painting and frame, “Herding Sheep” ........................ 35 00
Oil painting and frame, “Driving Cows to Pasture” .............. 38 00
Oil painting and frame, “Musical Afternoon” .................... 35 00
$183 00
•July 3, 1899:
One oil painting and frame, “Country Scene” ........................ $ 10 00
One oil painting and frame, “Huntters’ Return from Chase”........ 50 00
One mahogany secretary bookcase... 50 00
$110 00
November 27, 1899:
One antique pair of vases, with painting of Napoleon.................$ 55 00
One hand-painted center vase...... 15 00
One large pair of vases, one center vase to match, blue and gold...... 40 00
Bronzed clock and two ornaments.. 35 00
Three cut-glass cylinders, $5 apiece.. 15 00
$160 00
December 4, 1899:
Two antique vases and centerpiece, hand painted................... $ 45 OO
One mahogany, carved, lady's writing desk ....................... 25 00
Pour oil paintings and frames, painted by Buck..................... 200 00
$270 00
December 5, 1899:
One pair of hand-painted vases.....$ 40 00'
Pour mahogany sw-an’s neck rockers, antique........................ 30 00
One carved and inlaid console table 50 00
One full-carved mahogany card table 35 00
$155 00
February 21. 1901:
One pair of vases, hand painted, antique .......................... $ 25 00
And still other articles, said to have been purchased from other persons, are as follows:
Prom Crescent Jewelry Store, August 24, 1900:
1 diamond cluster 12-stone brooch.. $155 00
Prom same concern, March 5, 1900: 1 14k. gold watch, lady’s.......... $ 45 00
Prom same concern, December 5, 1900: 1 tiger-eye ring................... $ 6 50
1 amethyst ...................... 4 00
$ 10 50
Prom same concern, February 11, 1901: 1 pair of diamond earrings........ $ 55 00
Prom same concern, November 10, 1900: 1 gold ring, 9 rubies.............. $ 15 00
Prom P. Phillips & Co., October 17, 1900:
1 bedroom set, complete............$165 00
1 8-piece silk-plush parlor set...... 95 00
$260 00
From same concern, November 3, 1900 :
One quarter sawed oak sideboard.. . $ 40 00
6 quarter sawed oak high-back chairs ......................... 18 00
1 oak dining table .............. 12 00
$ 70 00
The persons from whom these purchases are said to have been made, with the exception of the plaintiff’s brother, seem to have disappeared, leaving no trace behind, and were not produced on the trial. The plaintiff’s neighbors, however, who lived in the *891 other side of the tenement, were called as witnesses for the defense; and one of them (a German woman) testified that she was in the habit of going into the plaintiff’s house every day, and that the furniture was all plain and cheap, such as poor people use; that the plaintiff’s wife dressed plainly, and had no jewelry, except a pair of earrings, and perhaps a ring; and that the pictures were of the cheapest kind. It is true that she showed that she knew nothing about fine pictures, and her testimony on that subject, taken alone, would be of little value; but another witness, who inspected the house after the fire, testified that the pictures that he found there were cheap chromos, worth about $4 or $5 a set; that the bedroom furniture, said to have been walnut, or veneered walnut, was stained poplar, etc.
And another witness testified that a wagon load of furniture was taken away after the fire.
There is but one other matter which need be specially noticed. The witness Berges was in defendant’s employ for a few months, and solicited the insurance out of which this litigation has arisen. Whether he was discharged, or left the defendant’s employ of his own accord, does not appear. Upon his cross-examination he testifies as follows:
“Q. How many risks did you insure with the Palfrey Agency? A. I don’t know, sir. Q. How many, other than this? A. I don’t know, sir. Q. Was it more than three? A. I don’t know. Q. Was it as many as three? A. I am sure I did. * * * Q. What other risks did you take? A. I don’t know. Q. Was it five, six, or seven? A. I know I furnished Mr. Palfrey a memorandum, and I had to file suit for my commission. Q. Did you file as many as ten? A. I don’t know. Q. As many as twenty? A. I couldn’t tell you ~ * * Q. You don’t know whether you filed one or one hundred? A. I know I filed more than one. Q. You don’t know how many more than one? A. No, sir.”
There are some other facts which might be commented upon if any good purpose would thereby be subserved, but we forbear. It is sufficient to say that; they all lead to the conclusion that but a small proportion of the property which the plaintiff pretends to have lost ever belonged to him, or was destroyed by the fire at his house. And that being the case, his deliberate and fraudulent attempt to impose upon the defendant liability for a loss which he has not sustained, according to the terms of the contract on which he sues, defeats his right to recover. Regnier v. Ins. Co., 12 La. 336; Claflin v. Ins. Co., 110 U. S. 81, 3 Sup. Ct. 507, 28 L. Ed. 76.
Judgment affirmed.