159 So. 705

### GARNIER et al. v. ÆTNA INS. CO. OF HARTFORD, CONN.

#### No. 32966.

Feb. 4, 1935.

Rehearing Denied March 4, 1935.

St. Clair Adams and St. Clair Adams, Jr., both of New Orleans, and Theus, Grisham, Davis & Leigh, of Monroe, for appellant.

Madison, Madison & Fuller, of Monroe, for appellees.

ODOM, Justice.

Plaintiff was the owner of a one-story frame residence on Boatner street in Bastrop, La., which was destroyed by fire about August 25, 1932. The property was insured by the defendant company against loss by fire for the sum of $3,000. Alleging that defendant was due the full amount of the policy, but that it had failed to settle the loss, plaintiff brought the present suit for $3,000, plus interest, statutory penalties, and attorney's fees.

The sole defense urged by the insurance company is that, subsequent to the date on which the house was destroyed, the assured has intentionally concealed and misrepresented material facts and circumstances concerning the insurance and the subject thereof, for which reason the policy was void and it was due assured nothing.

The house was mortgaged at the time of the fire to the Southern Kraft Corporation, and there was attached to the policy a loss payable clause making the proceeds of the policy payable to the mortgagee as its interest might appear. Defendant, although denying liability to the assured, concedes that, in so far as the mortgagee is concerned, its

rights were not affected by the alleged misconduct of the assured. Defendant therefore deposited in court at the inception of the trial the sum of $1,910.89; its contention being that this amount represented the full value of the property destroyed and that the mortgagee could recover no more than that, regardless of the amount of its claim. In connection with the deposit, defendant alleged that "the sum deposited * * * may be withdrawn at any time on motion of the Southern Kraft Corporation and on a showing that the amount of its mortgage and interest to date is in excess of that amount and upon Southern Kraft Corporation subrogating defendant to all its rights under its mortgage against W. V. Garnier," the assured.

This allegation was made, no doubt, to make it plain that defendant admitted no liability toward the assured. At the time of the trial there remained only $800 due the mortgagee. When this fact was shown, the defendant was permitted to withdraw all of the deposit in excess of that amount.

There was judgment for the plaintiff and the mortgagee in the sum of $2,270, with interest thereon at 5 per cent. from September 27, 1932, until paid, less $800 then on deposit. Plaintiff's demands for penalties and attorney's fees were rejected. Defendant appealed. Plaintiff answered the appeal, praying that the judgment be increased to $3,000 and that defendant be condemned to pay attorney's fees and statutory penalties.

The fire policy here involved was written under the provisions of Act No. 135 of 1900, which is an act "To fix the value of immovables by nature insured against loss or damage by fire, in case of loss or damage by fire."

Section 1 of that act provides:

"That whenever any policy of insurance against loss by fire is hereafter written or renewed, on property immovable by nature and situate in this State, and the said property shall be either partially damaged or totally destroyed, without criminal fault on the part of the insured or his assigns, the value of the property as assessed by the insurer or as by him permitted to be assessed at the time of the issuance of the policy, shall be conclusively taken to be the true value of the property at the time of the issuance of the policy and the true value of the property at the time of the damage or destruction."

Section 2 of the act reads as follows:

"Be it further enacted, etc., That whenever any policy of insurance against loss by fire, is hereafter written or renewed on property situate in this State, and the said property shall be totally destroyed without criminal fault upon the part of the insured or his assigns, the full amount of the insurance on the property so destroyed shall be paid by the insurer, and that when the said property shall be partially damaged, without criminal fault on the part of the insured or his assigns, the insurer shall pay to the insured such amount as will permit the insured to restore the damaged property to its original condition. Provided that nothing herein shall be so construed as to prevent the insurer from replacing property partially damaged or totally destroyed at his own expense and without contribution on the part of the insured."

It is not contended by the insurance company that the destruction of the property was due to criminal fault on the part of the insured. The defense set up by the insurance company was that the assured had, since the property was destroyed, willfully misrepresented facts in connection with the insurance, which misrepresentations, it is alleged, rendered the entire policy null and void under the following clause contained therein:

"This entire policy shall be void if the insured has concealed or misrepresented, in writing or otherwise, any material fact or circumstance concerning this insurance or the subject thereof; or if the interest of the insured in the property be not truly stated herein; or in case of any fraud or false swearing by the insured touching any matter relating to this insurance or the subject thereof, whether before or after the loss."

There arose some controversy during the trial of the case as to whether the building was totally or partially destroyed. Plaintiff alleged that the house was "practically" destroyed and "amounted to a total loss so far as your petitioners were concerned." The testimony discloses that the assured suffered total loss of his property as a result of the fire. The building, which was of wood structure, was not totally consumed. Parts of the walls and floors were left, but what remained was so badly damaged that it could not be used again and was worthless. The sills and floor joists were damaged, but had some value. They could have been taken up and parts of them, at least, could have been used in another structure. But, according to the testimony of all the building contractors who were called as witnesses, except one, what

remained of the building was practically, if not totally, worthless. Some of them said that, if the lumber which could have been salvaged had been sold at the market price, the amount obtained would not have been more than sufficient to clear the lot of rubbish.

On this point counsel for the insurance company say in their original brief at page 9:

"There is some question as to whether the loss was total or partial, as the foundation and floor sills were not destroyed and could be used in the reconstruction of the house. However, from the standpoint of our defense, it is immaterial whether the house was totally or partially destroyed."

This question is material, however, to plaintiff, because under the provisions of section 2 of the act above referred to, if the house was not a total loss, but was only damaged by the fire, the insurance company, if liable at all, is due the assured only such sum as would be necessary to restore the property to its original state. If there was a total loss, and if the assured has not rendered the policy null and void by fraudulent misrepresentations, as contended by the insurance company, then under the pleadings and under the law the assured is entitled to recover the full amount of the policy.

Our conclusion, after reading all the testimony, is that the property was a total loss to the assured.

According to the provisions of Act No. 135 of 1900, the insurer had the option of replacing the property at its own expense and without contribution on the part of the insured. The insurer elected to replace the house, and

so notified the insured, who assented. But the building was not replaced, due to a disagreement between the assured and the insurer over plans for a new house. There were negotiations extending over a period of several months relating to the replacement of the property, but no agreement was reached and nothing was done. It is defendant's contention that during these negotiations, and with reference thereto, the insured made willful false statements and representations as to the kind and value of the house and fixtures which were destroyed. So that, in defense of the action brought by plaintiff, the defendant alleged that the policy had been rendered totally void, and that therefore there was no liability in so far as the assured was concerned.

The specific fraudulent and willful misrepresentations attributed to the assured by the defendant are, first, that in making proof of loss the assured stated that the value of the house destroyed was $3,000, when he knew that it was worth much less than that amount; second, that, when it was agreed that defendant should replace the property and an architect was selected to draw plans and specifications for the new building, the assured instructed the architect "to prepare plans and specifications for a building of a better and more costly construction with refinements and fixtures not contained in the original building and of a far more expensive and costly nature, all of which was done by plaintiff in an attempt to and in furtherance of his plan to fraudulently collect from defendant money to which he was not entitled" (quoted from defendant's original brief, p. 6); and, third, that on various and sundry occasions during the progress of negotiations looking to the replacement of the building the assured made deliberate false representations as to the kind and character of the house destroyed and especially as to the kind and finish of the floors, and the kind of doors and fixtures and the finish of the closets, all for the deliberate purpose of defrauding the defendant.

■■ Fraud is never imputed except on legal and convincing evidence produced by the one alleging it. Strauss v. Ins. Co., 157 La. 661, 102 So. 861. The defendant therefore carried the burden of proving, not only that plaintiff made misrepresentations, but also that they were knowingly made with fraudulent intent.

■ The law applicable to cases of this kind is clear. In the leading case of Claflin v. Commonwealth Ins. Co., 110 U. S. 81, 3 S. Ct. 507, 515, 28 L. Ed. 76, the court said:

"A false answer as to any matter of fact material to the inquiry, knowingly and willfully made, with intent to deceive the insurer, would be fraudulent. If it accomplished its result, it would be a fraud effected; if it failed it would be a fraud attempted. And if the matter were material and the statement false, to the knowledge of the party making it, and willfully made, the intention to deceive the insurer would be necessarily implied, for the law presumes every man to intend the natural consequences of his acts."

The law in such cases is elaborately discussed in the case of Columbian Ins. Co. v. Modern Laundry (C. C. A.) 227 F. 355, 20 A. L. R. 1159. In a note following that case, as published in 20 A. L. R., the rule is stated

thus: "Where an insured knowingly and wilfully overestimates in his proof of loss the value of the property destroyed, with the intention of deceiving the insurer, such overvaluation will avoid the policy and defeat any right of the insured to recover thereon."

The rule announced above has been repeatedly recognized by this court. Marchesseau v. Merchants' Ins. Co., 1 Rob. 438; Regnier v. Marine & Fire Ins. Co., 12 La. 336; Schmidt v. Philadelphia Underwriters, 109 La. 884, 33 So. 907; Alfred Hiller Co., Ltd., v. Ins. Co., 125 La. 938, 52 So. 104, 32 L. R. A. (N. S.) 453; Richard D'Aigle Co. v. Western Ins. Co., 136 La. 777, 67 So. 827.

On the other hand, the uniform jurisprudence is to the effect that, where an assured overestimates the value of his property through mistake or inadvertence, the overvaluation does not amount to fraud sufficient to avoid the policy. See cases cited in note, 20 A. L. R. 1164, including the following Louisiana cases: Daul v. Firemen's Ins. Co., 35 La. Ann. 98; Erman v. Sun Ins. Co., 35 La. Ann. 1095; Dunn v. Springfield Ins. Co., 109 La. 520, 33 So. 585.

In Erman v. Ins. Co., supra, this court said:

"A discrepancy, even if it be material, between the statements of the assured under oath in his proof of loss, and those made at the trial, does not constitute the false swearing that works a forfeiture of all claim under a policy of insurance; nor does an overstatement of the value of the property work such forfeiture, for a great difference of opinion upon values may well co-exist with perfect honesty of all the persons differing. The assured may have sworn to what he believes to be true, but which nevertheless is false, and his policy would not thereby be forfeited."

Joyce on Insurance (2d Ed.) vol. 5, p. 5548, § 3339, says:

"An intent, however, must exist, and the general rule seems to be that the statement must be a wilfully false one concerning some material matter, and made with intent to deceive the insurer, in order to work a forfeiture."

As to the alleged fraud in overvaluing the house in the proof of loss submitted by plaintiff, we find the facts to be that, although requested to do so, the defendant did not furnish plaintiff with blanks for making proof of loss, as required by Act No. 168 of 1908, but, instead, sent to him, some twenty days after the fire, proof of loss made out with the value of the property inserted; the value being placed at something less than $2,000. The document, filled out by the adjuster without the concurrence of plaintiff, was sent to plaintiff by mail with request that he sign and return it. Plaintiff, not being satisfied with the value inserted by the adjuster, erased the figures as to the value and wrote in $3,000, signed the instrument, and returned it by mail. Previous to the date on which this was done, plaintiff had employed Miles Davis, a building contractor, to estimate the cost of rebuilding the house. Davis' estimate, which plaintiff had before him at the time, was $2,272.

Counsel for defendant argue that, in view of the Davis estimate, plaintiff knew when he signed the proof of loss that the building which was destroyed was not worth $3,000,

and that the statement made by him as to the value was a deliberate attempt to defraud the insurer.

However, we are not convinced that plaintiff overvalued the house. Furthermore, if we were convinced that he did, we find nothing in the record to serve as a basis for holding that he intentionally did so. It is true that Davis said that the house could be replaced for less than $3,000. McBride, who made an estimate for the insurance company, said it could be replaced for $1,983, and Watson's figures were $2,400.

But there were seven other witnesses, some of them building contractors and those who were not, having some knowledge of the value of such houses, who estimated the value of the house at from $3,000 to $5,000. Mrs. Barbay paid $3,600 for a residence across the street. She said hers was exactly like the one destroyed. This price probably included the lot. Edwards, a lumberman, said the house could be replaced for $3,000. Other estimates were: Tilberry, $4,000; McLennan, $3,600; McMeans, secretary of the building and loan association, $3,500; and Wimberly, a realtor, $4,000 to $5,000. Plaintiff testified that he thought the house was worth more than $3,000.

None of these witnesses had made a detailed estimate of the cost of replacement. They knew the size of the house, the finish, etc., and merely expressed their opinions as to its value. Plaintiff may have been mistaken as to its value. Even so, the testimony of these witnesses shows that others thought it was worth $3,000 or more. It cannot be said, therefore, that plaintiff, in valuing the house at $3,000 in the proof of loss was actuated by ulterior motives.

This policy was written under the so-called "Valued Policy Law" (Act No. 135 of 1900) quoted above. The insurance company itself assessed, "or permitted to be assessed at the time of the issuance of the policy," the value of the house at $3,000; that being the amount of insurance carried. This plaintiff was not the owner of the house at the time the policy was issued. He purchased the property later, and the policy was transferred to him by indorsement. From the fact that the company itself assessed the property, or permitted a value of $3,000 to be assessed on the property, to the knowledge of plaintiff, and the further fact that numerous witnesses thought it was worth that or more, we conclude that plaintiff did not deliberately attempt to defraud the insurer by placing the value at $3,000. The fact that Davis estimated the cost of replacement at $2,272, to the knowledge of plaintiff, is not sufficient to convict him of willfully attempting to defraud the insurer. Davis may have been mistaken. Plaintiff no doubt thought so.

The second imputation of fraud against plaintiff is that he ordered Volk, the architect selected to draw plans and specifications for the new building, to prepare plans calling for a much more expensive and better building than the one destroyed. This charge is utterly refuted by Volk himself, who testified that the plans and specifications were prepared by him and his office force without the slightest interference on the part of plaintiff, and that he never during the entire time talked to the plaintiff for more than five

minutes. The testimony shows that plaintiff had never lived in the residence and had been in the house only a few times; the majority of his visits there being on professional calls as a physician. He purchased the property from Jimmie Johnson, who was occupying it at the time and who continued to occupy it as a tenant up to the date of its destruction. Volk was asked this question: "Dr. Garnier told you what was in the building from information given him by others?" And he answered: "Yes, sir; he made this statement:—'I don't know what was in there and Jimmie does.'" (Page 121 of the record.) Volk was also asked: "Did Dr. Garnier tell you in the beginning that he did not know what was down there?" And he answered: "He told me all along, he said he would have to take Jimmie's word for it." The following testimony given by Volk is found on page 131 of the record:

"Q. Did you ever have a conference with Jimmie Johnson?

"A. No, sir; it must have been information from Jimmie Johnson to Dr. Garnier and then to me.

"Q. He held out all the time that what he knew about the house was what somebody else had told him?

"A. Yes, sir.

"Q. Did he make any positive statements that there were hardwood floors at all?

"A. He told me—that must have been where I got the information—'Jimmie said there were hardwood floors.' I took him at his word."

The testimony makes it perfectly clear that Dr. Garnier, the plaintiff, made no positive representations to Volk as to the floors, finish, or fixtures in the house, but always explained that he had no personal knowledge as to those matters, but that such information as he had came from Jimmie Johnson, the party from whom he purchased the house and the party who occupied it as a tenant from the date on which he sold it to the date on which it was burned. It is clear that Dr. Garnier thought that the kind of a house he was insisting upon would be no better than the one which was burned. Volk had no conference with Jimmie Johnson personally, but Dr. Garnier, the plaintiff, did, and such information as was conveyed to Volk by Dr. Garnier was based upon statements made by Johnson.

Jimmie Johnson was not called as a witness, and counsel for defendant argue that it was plaintiff's duty to call him. Counsel are mistaken, because the burden was upon defendant to show that plaintiff had deliberately misrepresented the facts and not upon the plaintiff to show that he had not done so. If Jimmie Johnson was available as a witness and, as suggested by counsel, if he would have given testimony against the plaintiff, it was defendant's duty to call him.

As to the third point, which is that plaintiff made false representations in the various conferences relating to the negotiations for replacing the property, we find that, whereas the plaintiff Dr. Garnier did refuse to accept the kind of a house which defendant proposed to build, yet there is no instance in which he deliberately misrepresented the facts. He contended all along that there were certain refinements about the house which defendant's representatives

claimed were not there. But we are convinced that plaintiff thought they were there and that he based his assertions upon information given him by Jimmie Johnson, whom he thought was reliable. We must therefore acquit plaintiff of the charges of fraud brought against him.

The defendant, having failed to make good its defense, must pay the full amount of the policy as required by Act No. 135 of 1900. Not only that, it must pay 12 per cent. of that amount as damages and reasonable attorney's fees for the prosecution and collection of such loss, as required by section 3, Act No. 168 of 1908. Payment of such damages and attorney's fees is mandatory. Isaac Bell, Inc., v. Security Ins. Co., 175 La. 599, 143 So. 705.

Counsel for plaintiff did not prove the value of their services. They prayed that a fee of $300 be allowed. That is not unreasonable, and should be allowed.

For the reasons assigned, the judgment appealed from is amended by increasing the amount from $2,270 to $3,000, the amount of the policy. In so far as plaintiff's demands for penalties and attorney's fees were rejected, the judgment is reversed, and it is now ordered that, in addition to $3,000, defendant pay to the assured 12 per cent. of that amount as damages and $300 as attorney's fees. In other respects the judgment is affirmed.

On Application for Rehearing.

PER CURIAM.

Some misunderstanding seems to have arisen as to the total amount the defendant is to pay. Under our decree, the defendant insurance company is to pay to the assured and to the mortgagee jointly, as the interest appeared on the day the judgment was signed in the district court, the sum of $3,000, plus interest, penalties, costs, and attorney's fees.

The amount on deposit in the registry of the court is to be turned over to the mortgagee, and, on final settlement with the assured, the defendant is to have credit for said amount.

Rehearing refused.