260 So.2d 706 (1971)
Susie Shelley PARKER, Plaintiff-Appellee,
v.
Herman RHODES, and Helen Parker Rhodes, Defendants-Appellants.
No. 11699.
Court of Appeal of Louisiana, Second Circuit.
November 16, 1971.
On Rehearing March 28, 1972.
*707 McIntosh, Hester, Gilfoil & Fox by George F. Fox, Jr., Lake Providence, for defendants-appellants.
Thompson L. Clarke, Watson & Watson by Philip B. Watson, Jr., St. Joseph, for plaintiff-appellee.
Before AYRES, HEARD and HALL, JJ.
HALL, Judge.
Plaintiff, Susie Shelley Parker, obtained a judgment in the district court against the defendants, Herman Rhodes and Helen Parker Rhodes, canceling and annulling in its entirety a deed and vendor's mortgage dated July 26, 1967. The deed transferred to defendants all of Mrs. Parker's interest in certain properties located in Tensas Parish, Louisiana. Defendants have appealed. We reverse the judgment of the district court.
The nature and factual background of the case are set forth in the district judge's written reasons for judgment as follows:
"Mrs. Susie Shelly Parker has filed these legal proceedings to rescind a sale *708 made by her to her daughter and son-in-law, namely, Mrs. Helen Parker Rhodes and Herman Rhodes. The basis for the demanded recission is that the execution of the deed by her was procured by fraud on the part of the defendants, and alternatively, plaintiff seeks to rescind the sale because no consideration was received by her and also because of lesion. Plaintiff seeks to have the rents and revenues of said property restored.
"Defendants filed an exception of no cause or right of action, which was overruled and further filed an answer and several supplemental answers denying the allegations of plaintiff's petition as amended. In the alternative in the event of judgment rescinding the sale, defendants demand that all sums paid by defendants for the account of plaintiff be returned to them, to the extent that said sums exceed the revenue derived from the real estate. In the reconventional demand specific sums paid by defendants on and for the benefit of the real estate, and other sums deposited in the `Mrs. Mae Shely' account in the Southern National Bank at Tallulah, Louisiana, aggregating $10,537.39, are asked to be returned. Plaintiff answered the reconventional demand, filed a motion to strike and a peremptory exception of no cause or right of action to the reconventional demand, both of which were overruled.
"For various and sundry reasons the trial was long and drawn out, commencing on November 28, 1967 and resumed on February 20th and 21st, 1968, and on February 26th and 27th, 1969 and terminating on March 11, 1969.
"Despite the lengthy transcript containing contradictory and conflicting evidence, the following facts are established:
"Zed Parker, husband of plaintiff, Mrs. Susie Shelly Parker and father of J. D. Parker, William Parker and defendant, Helen Parker Rhodes, died intestate on April 2, 1966. A judgment of possession was rendered September 15, 1966, in the Zed Parker succession, recognizing plaintiff herein as surviving spouse in community and as such, the owner of half of the property, with the usufruct of the other half, which was inherited by the three surviving children of the marriage, namely, J. D. Parker, Helen Parker Rhodes and William (Bill) Parker. The main assets of the succession were two noncontiguous tracts of farm land, the north tract known as Home Place containing 145.3 acres, and the south tract known as King Place containing 111.74 acres, or a total of 257.04 acres.
"At the time of Zed Parker's death in 1966, the elder son, J. D. Parker, leased and operated both tracts. In the spring of the following year, Mrs. Parker leased both parcels to her other son, William Parker, to farm. Within the period of a few months William's neglect of the crops, his costly operations, his excessive drinking, his mistreatment of his mother, and general misconduct resulted in complete disagreement between the son, William, and his mother. Because of his discontent, William Parker solicited the attention of Earl R. Banks, a real estate broker from Monroe, Louisiana, in an effort to bring about a sale, whereby he could get his part. Mr. Banks visited the property at least three times in the last part of June and the early part of July of 1967. On the third trip he obtained the signatures of Mrs. Susie Parker and William Parker to an instrument that is referred to as an exclusive listing of the subject property for sale. Mr. Banks testified he had contacted J. D. Parker and Mrs. Rhodes about the sale and purchase of the property. The testimony of Mr. Banks relating the facts of his visits to Mrs. Parker's home, vividly describes her changing attitude toward selling her property. At first she did not want to sell, even though William continued to press for a sale. Later she tearfully consented to list the property, because William insisted that he have his part, which she now wanted him to have. The validity of Mr. Banks' impression of Mrs. Parker yielding to the demands of Bill Parker for *709 her to sell in order for him to sell his part is supported by the testimony of the witnesses Melville, Mrs. Rhodes, and Mrs. Parker.
"On July 13, 1967, thirteen days before the execution of the deed contested herein, Mrs. Parker entered into a five year written lease of the King Place with Ford Powell, which seems relevant to determine the will of Mrs. Parker relative to a sale.
"Because of further disturbance created by William Parker, on July 17, 1967, Mrs. Parker went to Tallulah to stay with her daughter, Mrs. Rhodes. On July 20 and 21, 1967, Mrs. Parker and Mrs. Rhodes conferred with Mr. Philip Watson, an attorney in St. Joseph, Louisiana, who assured them that the son or sons could not compel plaintiff to sell, and during which time Mrs. Parker executed a will favoring Mrs. Rhodes with the disposable portion. On July 22, 1967, Mrs. Parker, Mrs. Rhodes and Mr. Rhodes conferred with Miss Alwine L. Mulhearn, attorney at law, in Tallulah, Louisiana. Then, on July 26, 1967, the deed and mortgage, evidencing the sale that is now under attack, was executed in the office of Miss Mulhearn. Immediately after the signing, and on the same day, Mr. and Mrs. Rhodes took Mrs. Parker to the office of Dr. Whittaker in Newellton in fulfillment of a previous appointment, and they drove on to St. Joseph and recorded the document with the Clerk of Court. They then returned to Newellton and picked up Mrs. Parker and took her to the office of the Town Marshal in Newellton to confer with J. D. Parker, pursuant to previous arrangements. Although the purpose of the conference was to discuss the possible disposition of Mrs. Parker's interest in the properties, there was no mention of the purported sale by either the vendor or vendee.
"Mrs. Parker returned to her home on the property on July 27, 1967, and before the day was over William Parker created another disturbance, which resulted in Mrs. Parker being taken to the home of Mr. and Mrs. Rhodes by Mr. Ford Powell. The following day, July 28, 1967, Mrs. Rhodes drove Mrs. Parker to St. Joseph, and a complaint was signed by Mrs. Parker against William Parker, charging him with disturbing the peace. William was arrested the same day, and on July 29, 1967, he was released on bond and apparently left the area permanently.
"Mrs. Parker returned to Tallulah with her daughter and remained there until she was returned by defendants to her home on the subject property on about September 7, 1967. During the month of August, Mrs. Parker and Mr. and Mrs. Rhodes often spent the day time on the Parker place in Tensas Parish attending to various chores and business dealings relating to the place. In fact, on August 11, 1967, Mrs. Parker acknowledged in an affidavit that William Parker was no longer farming the property and that she had sold her interest, including the usufruct to Mr. and Mrs. Herman Rhodes. However, the purpose of this affidavit was to satisfy the Agricultural Stabilization and Conservation Service (ASCS) that the government payments should be paid to Mr. and Mrs. Rhodes rather than William Parker, who had initially signed the participation application for the year 1967. This affidavit and a copy of the deed were filed with the ASCS office in St. Joseph, Tensas Parish.
"On August 24, 1967, Mrs. Rhodes handled the opening of an account in the Southern National Bank at Tallulah, Louisiana, styled `Mrs. Mae Shely', with the initial deposit of $536.00, the source of which was a withdrawal of an account of Mrs. Parker in another bank. The only activity in this account has been the withdrawal of $446.97, by a check dated September 7, 1967 in favor of Helen P. Rhodes, signed by plaintiff as Mrs. Mae Shely. Then, on November 14, 1967, defendants deposited to this account the sum of $3,200.00, which they contend represented the annual payment of $1,200.00, plus an additional $2,000.00 promised to Mrs. Parker at the time of the execution of the deed, and *710 to be paid when the ASCS payments earned by the farm for the year 1967 were received.
"At the time of the execution of the deed and on through the extended trial of the case, Mrs. Parker was in ill health and was receiving medical treatment. She was 68 years of age at the time of the execution of the deed, and the extent of her formal education was to the fourth grade.
"The conflict in the verbal testimony of the parties prevents a solution of the question of whether there was mutual intent and consent between the parties. The testimony of defendants, Mr. and Mrs. Rhodes, indicates they were doing what Mrs. Parker wanted done, on terms that she understood and agreed to. On the other hand, Mrs. Parker denies her consent to a sale, and insisted she understood they were merely arranging for the Rhodeses to take over the crop and to put an end to the liability of the property for the debts made by William Parker. In the trial the defendants were more impressive than the plaintiff, but, to me, the surrounding circumstances and happenings offer the greater probative force."
The first issue presented on this appeal relates to the plaintiff's charge that her signature on the deed was procured by fraud on the part of the defendants. The testimony of plaintiff and defendants is in direct conflict. Throughout the trial, Mrs. Parker denied that she ever intended to sell the property to the defendants. In fact, she denied her signature on the deed and alleged that she only signed a blank piece of paper. On appeal, she admits her signature on the deed.
Defendants and Miss Alwine Mulhearn, the attorney who handled the closing of the transaction, testified that the attorney read the entire deed to Mrs. Parker and that she, Mrs. Parker, understood she was selling the property to the defendants. The fact that Mrs. Parker knew she sold the property to defendants is further supported by an affidavit to that effect which she signed and which was delivered to Mr. Richard J. Sasser in the ASCS office in St. Joseph, Louisiana.
In spite of this testimony and the affidavit which she signed, Mrs. Parker has consistently argued that she only intended to give the defendants the right to take over the farming operations on the property and to facilitate paying off a mortgage on the property held by the Winnsboro State Bank. She alleged that she never intended to sell the property and that the defendants fraudulently procured her signature on the sale.
The burden of proving fraud rests on the party alleging it and it is indeed a serious one. In Sanders v. Sanders, 222 La. 233, 62 So.2d 284 (1952), the Supreme Court discussing allegations of fraud, defined the burden of proving it as follows:
"In the jurisprudence of this court it has been said that the charge of fraud is a most serious one; that one who alleges fraud has the burden of establishing it by legal and convincing evidence since fraud is never presumed, and that to establish the fraud exceptionally strong proof must be adduced. Strauss v. Insurance Co. of North America, 157 La. 661, 662, 102 So. 861; Garnier v. Aetna Ins. Co. of Hartford, Conn., 181 La. 426, 159 So. 705; Mutual Life Ins. Co. of New York v. Rachal, 184 La. 430, 166 So. 129; Metcalf v. Monsour, 195 La. 570, 197 So. 235; Mente & Co., Inc., v. Roane Sugars Inc., 199 La. 686, 6 So.2d 731; American Guaranty Co. v. Sunset Realty & Planting Co., Inc., 208 La. 772, 23 So.2d 409. It has also been said that evidence showing that the fraud was probable or that the circumstances partook of a suspicious character is not sufficient, and that the fraud must be established by proof stronger than the mere preponderance of the evidence. Angichiodo v. Cerami, D.C., 35 F.Supp. 359; Fort v. Metayer, 10 Mart. (O.S.) 436; Charrotte v. Louisiana College, 1 La.App. 438; Woodward v. Barringer, La. App., 24 So.2d 200."
*711 The district judge recognized the seriousness of the burden of proving fraud but found that the burden resting on Mrs. Parker in the instant case "* * * is substantially lightened because of the confidential and fiduciary relationship of the parties." He held that the defendants guided and directed Mrs. Parker's thoughts and acts in ways which were detrimental to her and most beneficial to them.
The mere fact of the relationship of parent and child does not create any presumption of fraud or affect the burden of proof. The relationship of the parties here does not in itself create a fiduciary relationship. Counsel for Mrs. Parker argues that because of her age and lack of education the defendants were duty bound to look after her best interests and that they did not do so because the sale of the property was beneficial to them. In Cannon v. Hunt, 165 So.2d 523 (La.App. 1st Cir. 1964), the court dealt with similar allegations of fraud made by two elderly plaintiffs who were almost blind and deaf. In reversing the trial court's recision of the sale in question, the appellate opinion declares:
"* * * while it is true that plaintiff's age and physical condition may have been a contributing factor to agreeing to the lease that factor in itself would not constitute fraud and misrepresentation such as would enable him to set aside the sale."
It is true that the sale to the defendants in this case was not as advantageous to the plaintiff as one she could probably have made in an arms-length transaction with a stranger. However, the mere fact that a person makes a sale for less than full value does not raise a presumption that fraudulent misrepresentations have been made by the party who benefited by the agreement.
Despite Mrs. Parker's allegations that she did not intend to sell her interests to the defendants, the fact remains that the entire document was read to her and she affixed her signature thereto. There is nothing in the record other than plaintiff's own testimony to show that the defendants attempted to conceal from Mrs. Parker the true nature of the contested instrument.
Plaintiff produced the testimony of several witnesses who testified that prior to the date of the agreement with defendants, Mrs. Parker had refused several offers to buy the property. This testimony was offered to show that she had no desire to sell the property and did not intend to sell it to the defendants. However, Mr. Earl Banks, a real estate broker from Monroe, testified that he went to see Mrs. Parker in the summer of 1967 some time prior to the date of the contested act of sale and after some discussion she told him she was ready to sell. In fact, she signed an exclusive listing agreement with Mr. Banks. His testimony corroborates the fact that Mrs. Parker, probably due to the insistence of William Parker, had decided to sell the property. Her intent in this regard is further verified by statements to this effect made by her to another witness, Vernon Melville.
The allegations of fraud made by Mrs. Parker have not been supported by "exceptionally strong proof." Sanders v. Sanders, supra. It is not sufficient to show that suspicious circumstances existed or that fraud may have been committed. We, therefore, find that plaintiff has failed to prove any fraud or misrepresentation on the part of the defendants induced her to sign the deed. To the contrary, we find the weight of the evidence is that plaintiff decided to sell the property, preferred at the time to sell it to her daughter and son-in-law even at a reduced price, executed a deed with awareness of what she was doing and the terms thereof, and then later changed her mind and sought to rescind the sale.
Plaintiff next contends that the sale is null and void for want or failure of consideration. *712 Plaintiff argues that the evidence shows the note representing the entire purchase price was never delivered to plaintiff, and, therefore, plaintiff never received any consideration whatsoever for the sale. Plaintiff testified she never saw any note and that no note was ever delivered to her. Defendants and Miss Mulhearn testified that at the closing of the transaction in Miss Mulhearn's office, the note was executed by defendants and Miss Mulhearn then handed it to plaintiff. Plaintiff said she had no place to keep the note so Miss Mulhearn offered to keep it in her lockbox or safe which plaintiff agreed for her to do. Miss Mulhearn wrote out a receipt for the note in her regular receipt book and handed the receipt to plaintiff. Miss Mulhearn's secretary verified the fact that the issuance of the receipt was reflected by the receipt book copy. The note remained in Miss Mulhearn's safe deposit box until it was produced at the trial. The receipt was also produced at the trial, having been found in a folder where plaintiff kept some of her papers which folder was left at defendants' home by plaintiff. When they discovered the folder it was delivered to Miss Mulhearn who kept it in her safe until it was produced at the trial.
The note and the receipt were produced and offered into evidence by defendants at the trial over plaintiff's objection. Plaintiff's objection was based on certain answers given by defendants in response to a motion to produce filed by plaintiff. Pursuant to the motion to produce filed on October 17, 1967, defendants were ordered to produce the $26,250 promissory note, the receipt allegedly executed by "plaintiff" pertaining to said note, and other documents. In an answer to the motion for production of documents filed on behalf of defendants by Miss Mulhearn, who was then representing defendants in this litigation, defendants stated that they did not have possession of the promissory note or of any such receipt. When these documents were produced and offered into evidence by defendants at the trial, at which time defendants were represented by another attorney, Miss Mulhearn having withdrawn as counsel, plaintiff objected to the introduction of the documents and requested the court to prohibit the introduction thereof under Article 1513 of the Code of Civil Procedure. Article 1513 provides:
"If any party or an officer or managing agent of a party refuses to obey an order made under Article 1511, or Article 1492, or Article 1493, the court may make such orders in regard to the refusal as are just, and among others the following:
* * * * * *
"(2) An order refusing to allow the disobedient party to support or oppose designated demands or defenses, or prohibiting him from introducing in evidence designated documents or things or items of testimony or from introducing evidence of physical or mental condition;
* * *"
The trial judge, exercising his sound discretion, refused to prohibit the introduction of the documents into evidence. We find no error in the trial judge's ruling in this regard. First of all, the action provided for in Article 1513 is not mandatory but lies within the discretion of the court. Secondly, the answers made by defendants through their attorney were technically correct. Although defendants' attorney at that time had possession of the note she was holding the note on behalf of plaintiff, and defendants did not have possession or control of the document. At the time the answer was made defendants did not know the whereabouts of the receipt. In stating that the answers were technically correct we must note that the answers were deceptive under the circumstances and we pass only on the admissibility of the document and not on the propriety of the action of Miss Mulhearn.
*713 We hold that the sale is not voidable because of failure of consideration as we find that the note was executed, delivered to plaintiff, and held by Miss Mulhearn on behalf of plaintiff. Additionally, defendants paid $6,000 to satisfy an existing mortgage indebtedness against the property as a part of the consideration for the sale. Also, at the same time the deed was executed, defendants signed a letter agreeing that plaintiff could live in the house on the property for the remainder of her life.
Plaintiff contends, alternatively, that the sale should be set aside because of lesion beyond moiety.
Pertinent here are the following articles of the Civil Code:
"Art. 1860. Lesion is the injury suffered by one who does not receive a full equivalent for what he gives in a commutative contract. The remedy given for this injury, is founded on its being the effect of implied error or imposition; for, in every commutative contract, equivalents are supposed to be given and received."
"Art. 1861. The law, however, will not release a person of full age, and who is under no incapacity, against the effect of his voluntary contracts, on account of such implied error or imposition, except in the two following cases:
* * * * * *
"2. In sales of immovable property, the vendor may be relieved, if the price given is less than one-half of the value of the thing sold; but the sale can not be invalidated for lesion to the injury of the purchaser."
"Art. 1862. Lesion can be alleged by persons of full age in no other sale than one for immovables, in which is included whatever is immovable by destination."
"Art. 1870. When lesion is alleged to invalidate a partition or sale, the party alleging it must first prove the value of the property sold, in the state in which it was at the time of the contract, according to the usual terms of credit given on sales of property of that description. He must then show how much the price given was less than such value; but if the price given was paid at longer periods than those usually given on such sales, the interest for the time exceeding such usual credit must be deducted from such price; or, if the price was paid in shorter periods than those of such usual credit, then the interest for the time such payment has fallen short of the usual credit, shall be added to the price actually paid; and from a comparison of the price after these additions or deductions with the estimated value, the court shall determine whether according to law applied to the circumstances of the case, there is a lesion sufficient to invalidate the contract."
The trial judge, although basing his decision to set the sale aside on error and lack of consent, further held that the sale was voidable on the basis of lesion. The trial court found that the evidence establishes that the properties involved, containing 257.04 acres with about 168 acres of crop land and about 89.04 acres of wood land, and with a cotton allotment of 48.8 acres, had a value of $300 per acre or a total value of $77,112. The vendor's undivided one-half (½) interest in the property would, mathematically, have a value of $38,556. While recognizing the principle established in the jurisprudence that an undivided interest is less valuable than its mathematical proportion to the whole, the court held that this difference is at least offset by the value of the usufruct over the other undivided interests which the vendor also sold.
As to the price paid, the trial court held, as contended by plaintiff, that the note in the principal amount of $26,250 payable in *714 twenty-one annual installments of $1,200 and one installment of $1,050, without interest except from maturity, amounted to a price of no more than $14,996.69 to plaintiff. This finding was based on evidence that the commuted value of such a note payable in such a manner, at six per cent (6%) interest, had a present value as of the date of the note of $14,996.69. Thus, the court held, the price paid of $14,996.69 was less than one-half (½) of the $38,556 value of the property sold.
We conclude that this finding was in error for the principal reason that it failed to take into consideration, as part of the price paid, the sum of $6,000 which defendants agreed to pay and did, in fact, pay in satisfaction of an existing mortgage indebtedness against the property.
The evidence shows that plaintiff and her son, William Parker, executed a demand note in favor of the Winnsboro State Bank, secured by a mortgage against their undivided interests in the property, the entire balance of which remained due on the date of sale. This mortgage was not mentioned in the act of sale but Miss Mulhearn testified that she calculated the price agreed on by the parties at $250 per acre to be approximately $32,250, from which she deducted the amount of $6,000 to be paid on the mortgage, leaving a balance of $26,250 which was the price recited in the deed and for which a note was given. Defendants did, in fact, pay off the $6,000 mortgage indebtedness prior to the filing of this suit by plaintiff.
In determining the price paid, we agree that the $26,250 note, which varied from the usual terms of credit both in length of time given for payment and in providing for interest only from maturity, must be valued at less than the face amount thereof. Civil Code Article 1870 provides that if the price given was paid at longer periods than those usually given on such sales, the interest for the time exceeding such usual credit must be deducted from such price and then the price after making such deduction should be compared to the value of the property sold to determine whether there was lesion sufficient to invalidate the contract. While the provisions of this Article do not fit the instant situation exactly, the codal article evidences the intent of the law to adjust a credit price where the terms of credit vary from usual terms of credit both as to length of the term and as to interest rate.
Louis Buckner, a certified public accountant, calculated the commuted value of the note by taking the present value, as of the date of the note, of each annual payment, based on six per cent (6%) interest, and arrived at a value of $14,996.69. W. E. Hawkins, a bank officer, testified that twenty-one (21) annual payments as provided for in this note would amortize a principal amount of $14,992.90 at six per cent (6%) interest. We conclude that for the purposes of determining whether there was lesion, the note represented a price paid of $14,996.69.
To this amount, however, must be added the $6,000 paid by the defendants to satisfy the mortgage indebtedness, which amount was an integral part of the price or consideration. Thus, the total price was $20,996.69. Accepting the value of the property sold as being the mathematical one-half (½) of the total value of the land or $38,556, the price paid exceeds one-half (½) of such value and there was no lesion beyond moiety.
Defendants urge further that lesion cannot be applied in this instance because the value of the undivided interest sold and the value of the usufruct sold are so speculative and conjectural that a certain value of the property sold cannot be ascertained. Defendants argue that the vendor has the burden of proving lesion beyond moiety and the evidence establishing this fact must be particularly strong and convincing and of such a nature as to exclude speculation and conjecture. This argument may have merit as applied to the *715 evidence in this case. None of the witnesses testifying as to the value of the land were willing to express an opinion as to the effect on value of the interest sold being an undivided interest or as to the value of the usufruct which was subject to termination upon death or remarriage of the vendor. We do not find it necessary to pass on this issue specifically in that we have concluded that there was no lesion based on an evaluation of the property in a manner most favorable to plaintiff under the evidence presented at the trial.
For the reasons assigned, the judgment of the district court is reversed.
It is ordered, adjudged and decreed that there be judgment herein in favor of defendants, Herman Rhodes and Helen Parker Rhodes, and against plaintiff Susie Shelley Parker, rejecting plaintiff's demands and dismissing plaintiff's suit at plaintiff's costs. The property involved in this suit is described as follows:
(1) A tract or parcel of land found to be in Section 1, T. 13 N., R. 10 E. of Tensas Parish, Louisiana. This tract containing exactly 148.9 acres of ground inclusive of 3.6 acres of roadway accepted as Louisiana Highway, leaving a total acreage of 145.3 acres. Description as follows:
Beginning at a stake near Persimmon Tree on the East Bank of Tensas River and running along the bank South 54 degrees East 800 feet to a point; thence South 53 degrees 25' East 432 feet; thence South 39 degrees 44 minutes East 363 feet to a point; thence South 29 degrees 04' East 338 feet to a point, thence South 23 degrees 23' East 1134 feet to a point; thence South 18 degrees 48' East 106 feet to a point where South line of Section 1 hits top of East Bank of Tensas River; thence East across roadway and running 1293.6 feet to Southeast corner of Section 1, thence North 2706 feet to point ¼ corner of Section 1, thence West 1320 feet to stake; thence North 1248 feet to a stake; thence South 50 degrees West 2325 feet crossing the highway on Tensas River Bank and to stake near Persimmon Tree, the point of beginning, said above described property being fully described by map or plat of survey made by Jas. T. Evans, Reg. C. E. recorded in Notarial Record "X" page 256 of the records of Tensas Parish, La. date of recordation February 1st, 1934.
Together with all buildings and improvements thereon, and all rights, ways and appurtenances thereunto belonging or in any manner appertaining.
Said property having been acquired by Zed Parker from J. L. Rogers, as shown by deed dated September 1, 1943, recorded September 1, 1943 in Notarial Book "GG" page 450, records of Tensas Parish, La. (2) All of the E/2 of the NE/4 of Section 24, T. 13 N., R. 10 E. lying East of Tensas River, which lies North of the Newellton-Winnsboro State Highway and West of the Tensas Bluff State Highway gravel road, and containing 53 acres of land, more or less; the said tract of land being bounded as follows: On the West by Tensas River and the West line of the E/2 of the NE/4 of said Section; on the South by the Newellton-Winnsboro State Highway; on the East by the Tensas Bluff State Highway; and on the North by the North line of said Section 24.
The NW/4 of the NW/4 of Section 19 in T. 13 N., of R. 11 E., and all that part of the NE/4 of the NE/4 of Section 24 in T. 13 N., of R. 10 E. which lies East of the Gravel Highway running in a general North and South direction across said Section 24; said lands containing in the aggregate 50 acres of land, more or less.
Together with all the buildings and improvements thereon, and all rights, ways and appurtenances thereunto belonging or in any manner appertaining.
Said property having been acquired by Zed Parker from J. L. Rogers, as shown by deed dated October 27, 1954, recorded *716 October 28, 1954 in Notarial Book 2, page 280, records of Tensas Parish, La.
(3) A portion of land in Section 19, T. 13 N., R. 11 E. and Section 24, T. 13 N., R. 10 E. being bounded on the West by the Tensas Bluff Road, on the South by the old Newlight Road, on the North by the South line of the NW/4 of the NW/4 of Section 19, T. 13 N., R. 11 E. and also on the North by the South line of the NE/4 of the NE/4 of Section 24, T. 13 N., R. 10 E., coming to one common point on the East, further described as follows:
From the Southeast corner of the NW/4 of the NW/4 of Sec. 19, T. 13 N., R. 11 E., go 79.81 on the bearing of N. 89 53' to a point of beginning, this point being 30' North of the old Newlight Road; thence N. 89 53' W. a distance of 1247.88; thence S. 89 42' W., a distance of 249.0', this point being 30' East of the centerline of the Tensas Bluff Road; thence S. 4 15' W. a distance of 508.5' this point being 30' East of the centerline of the Tensas Bluff Road and 30' North of the centerline of the old Newlight Road, thence N. 71 54' E., a distance of 1614.44' to the point of beginning, containing 8.74 acres, more or less.
Said tract being more fully shown and described on map or plat of survey made by Carl D. Ingram, Civil Engineer, dated March 25, 1959.
Said property having been acquired by Zed Parker from J. L. Rogers, as shown by deed dated April 2, 1959, recorded April 4, 1959 in Notarial Book 6, page 76, records of Tensas Parish, La.
Reversed and rendered.

ON REHEARING
Before AYRES, BOLIN, PRICE, HEARD and HALL, JJ.
BOLIN, Judge.
We granted unlimited rehearing in this long, hard-fought case to permit the full court opportunity to examine in detail all of the evidence, exhibits and the applicable law in order to ascertain whether our reversal of the lower court's findings of fact and legal conclusions was correct. We find our original opinion was correct.
Although we do not feel called upon to justify the conclusion, we will discuss some of the issues which might have raised doubts sufficiently strong to cause us to grant the rehearing.
In brief on rehearing, counsel for Mrs. Parker has pointed specifically to seven alleged errors which it is contended were committed by this court. They are itemized in the following manner:
The trial judge's findings of fact, particularly those involving the credibility of witnesses testifying before him, are entitled to great weight and his conclusions as to these facts will not be disturbed unless found to be clearly erroneous.
This Honorable Court has erred in holding that the trial court adopted a presumption of fraud because of the parent-child relationship between plaintiff and defendant, or solely because of her physical and mental condition.
The revenue produced by said property greatly exceeded the annual payments required by the terms of the sale.
The original receipt was retained by Miss Mulhearn.
The attorney-client relationship between Mrs. Parker and Miss Mulhearn was terminated by the filing of this suit.
Payment of the mortgage from income produced by the Parker property did not constitute consideration for said sale.
The value of the usufruct must be considered in determining lesion beyond moiety.
We consider first the contention we erred in overruling the trial judge's *717 finding that the sale from plaintiff to defendant was tainted with fraud. Realizing full well we are under a duty to accord great weight to the findings of the trial judge, particularly when based upon the credibility of witnesses which he has observed, we, nevertheless, are permitted and, in fact, have the duty to determine if he was justified in his conclusions. Although the circumstances may have indicated otherwise, no real legal evidence has been produced to prove plaintiff was the victim of ill-practice, fraud or deception. While Mrs. Parker may presently be of the opinion she wishes to rescind her sale contract [for reasons which we can neither discern nor is it within our province to speculate], nevertheless we are convinced that at the time of the signing of the deed Mrs. Parker was aware of and fully informed of the nature of the instrument and that her act of signing the deed was done voluntarily and without undue influence. From examination of Mrs. Parker's own testimony we are convinced she was anxious to complete the consummation of the sale (thus relieving herself of the burden caused by pressures exerted upon her by her youngest son) and that she was, in fact, the real instigator of the entire transaction.
Concerning applicant's second contention, that this court erred in holding the trial court adopted a presumption of fraud because of the parent-child relationship, we believe applicant has misconstrued our opinion. We quoted directly from the trial judge's written reasons wherein he quoted from American Jurisprudence stating that the relationship of parent and child created a fiduciary relationship which "substantially lightened" the burden resting upon Mrs. Parker to prove fraud. Our opinion did not, and was not intended to say the trial court relied on a "presumption" of fraud arising out of the parent-child relationship between plaintiff and defendant. We consider the evidence offered by Mrs. Parker failed to discharge her burden, even though "lightened", of proving fraud.
Third, the fact the revenue produced by the property exceeded the annual payments required by the terms of the sale lends credence to our conviction, gained from the other evidence adduced, that Mrs. Parker was determined to sell the tract of land in order to avoid further harassment by her younger son, William Parker.
Specifications four and five have been adequately discussed and properly disposed of in our original opinion and we pass now to the question of whether or not payment of the mortgage from income produced by the Parker property constituted part of the consideration for the sale. In urging the negative of this proposition applicant cites Spiers v. Davidson, 233 La. 239, 96 So.2d 502, 505 (1957). We find that case readily distinguishable from the instant case. In Spiers the sole issue was whether plaintiff had stated a cause of action in a petition seeking to have a purported sale declared void as a simulation. It was alleged there was No consideration paid since all the funds to be expended in paying off a mortgage by vendee [which was the principal consideration] were to be derived from vendor's property; that the true intention of the parties was that vendee would pay the debts and a certain monthly amount to the vendor during her life, all to be paid from rents and revenues of the property; and that upon vendor's death the property would be reconveyed to plaintiff who was the sole heir of the vendor. The court held the petition stated a cause of action and remanded the case for further proceedings.
In the case before us the payment of the $6,000 mortgage was not the sole consideration for the sale. Rather, it was added to the note for $26,500 to make up the total consideration of $32,500. According to the terms of the agreement this note was secured by a mortgage on the property; vendees agreed not to alienate, mortgage or in any manner encumber the mortgaged property to the prejudice of this act; if the note or any part was not *718 promptly paid at maturity, then that part of the note remaining unpaid would be deemed due and payable. Additionally, vendees agreed to pay the taxes; not to commit waste; to keep the premises insured for the reasonable value including all buildings and improvements, the insurance contract to contain a mortgage clause; to waive any homestead rights and finally, the deed contained a confession of judgment in case of failure of vendees to promptly pay the annual payments on the note at their respective maturities. These obligations, undertaken by defendants, far exceeded the duties imposed upon defendant in Spiers.
We come now to the last contention and the one most urgently argued on rehearing, that the value of the usufruct must be determined and added to the land value to arrive at fair market value for purposes of deciding if the sale should be rescinded for lesion under Louisiana Civil Code Article 1861. In our original opinion we adopted the value placed on the property by the trial judge, i. e., $38,500, being one-half of the total market value of the whole tract, at $300 per acre. We, as did the trial court, recognized that an undivided one-half interest in the property is less valuable, proportionately, than the whole. However, we recognized that this difference is at least offset by the value of the usufruct over the other undivided interest which the vendor also sold. Based upon this value and assigning to the price paid a value of $20,996.69 [arrived at by discounting the $26,500 note to $14,992 and adding thereto the $6,000 mortgage payment], we concluded the sale was not subject to rescission for lesion beyond moiety. We reaffirm this finding.
However, in fairness to applicant, we shall examine his argument that a separate, specific value of $16,380.44 should be assigned to the usufruct and added to the land value.
In support of the contention that the property conveyed had a value in excess of $41,992, plaintiff makes the following calculations: defendants acquired a fee title to an undivided one-half interest worth an estimated $38,500, plus the usufruct of the other one-half interest which he argues should be valued at $16,380.44, or a total value received by Mr. and Mrs. Rhodes of $54,936.44. The figure of $16,380.44 as the value of the usufruct was calculated by using the American Experience Mortality Tables utilized under the authority of Louisiana Revised Statutes 47:2405 in determining inheritance taxes due the state. These tables set up an arbitrary formula and none of the factors affecting market value (of the usufruct) are considered in determining the tax due. There are no statutes, codal articles or cases cited to support the argument that this is a proper or accepted method of determining the "market" value of a usufruct for any other purpose.
However, defendants counter with the argument that a usufruct over realty is not an immovable, since it constitutes only a right of enjoyment, including collection of rents and revenues, and ceases at the death of the usufructuary. Therefore, they contend the value of this right may not be taken into consideration in a suit seeking rescission of a sale for lesion beyond moiety, citing Louisiana Civil Code Articles 1862, 2590 and 2594, which provide:
"Art. 1862. Lesion can be alleged by persons of full age in no other sale than one for immovables, in which is included whatever is immovable by destination." (Emphasis ours)
"Art. 2590. To ascertain whether there is a lesion beyond moiety, the immovable must be estimated according to the state in which it was, and the value which it had at the time of the sale, or at the time the option was granted if the sale be made pursuant to a valid contract of option. (As amended by Acts 1950, No. 154.)"
"Art. 2594. Rescission for lesion beyond moiety is not granted against sales of movables and produce, nor when rights *719 to a succession have been sold to a stranger, nor in matter of transfer of credits, nor against sales of immovable property made by virtue of any decree or process of a court of justice."
While a usufruct over real property partakes of the nature of an immovable for certain purposes, nevertheless it has not, so far as we can determine, been classified as an immovable for purposes of rescission of a sale for lesion beyond moiety. However, in view of our original ruling on the value of the entire interest conveyed by Mrs. Parker, any discussion of the application of the doctrine of lesion to a contract of sale of a usufruct over an immovable is purely academic.
Accordingly, our original judgment is reinstated.