457 So.2d 64 (1984)
Dodge E. MULLINS, Plaintiff-Appellant,
v.
James Franklin PAGE, Defendant-Appellee.
No. 16386-CA.
Court of Appeal of Louisiana, Second Circuit.
August 22, 1984.
Writ Denied November 9, 1984.
*66 Hargrove, Guyton, Ramey & Barlow by J. Marshall Jones, Jr., Shreveport, for plaintiff-appellant.
Bowers & Bowers by Gary A. Bowers, Shreveport, for defendant-appellee.
Before PRICE, JASPER E. JONES and SEXTON, JJ.
PRICE, Judge.
Plaintiff, Dodge E. Mullins, appeals from a judgment denying the rescission of the sale by him of certain immovable property to defendant, James Franklin Page, on the grounds of lesion beyond moiety.
The facts reveal that the subject property is a somewhat irregularly shaped tract consisting of approximately three acres. The property is located at 3312 North Market Street (also known as U.S. Highway 71 and Louisiana Highway 1) between Deer Park Road and Booth Drive within the corporate limits of Shreveport, Louisiana. North Market Street is a four-lane boulevard. The property is in the northern portion of the city in a neighborhood generally known as the North Highlands area. The boundaries of the neighborhood are Twelve-mile Bayou on the east, Pine Hills Road or a projection thereof on the north, Interstate 220 on the south, and undeveloped lands to the west just off North Market Street. The neighborhood is primarily residential with some commercial zoning classifications. The subject tract is zoned B-2, neighborhood business district.
The subject property is unimproved except for six abandoned buildings which formerly served as a motel travel court known as Spring Court. The buildings are in an advanced state of deterioration. At the time of the sale, there was a pond located on the northeastern portion of the property which was approximately 1.24 to 1.3 acres in size. The pond had been created by an earthen dam and a concrete overflow structure with a culvert type overflow. The property or a portion thereof was considered to be in a flood hazard zone.
In February 1979, defendant purchased a piece of property from plaintiff and his niece, Barbara Sneed, adjacent to the subject tract. Several months later, defendant acted as a realtor for Mullins and listed the subject tract for sale. The subject property had been donated to the plaintiff by his mother. Plaintiff, Mullins, later requested that Page personally purchase the property. Defendant testified that he asked plaintiff to obtain a value on the property and then he would make an offer.
At the time of these negotiations, plaintiff was being cared for by the Fellowship Mission Center in Shreveport, Louisiana. The president and director of the center, Reverend Bobby Henderson, contacted Mark Montgomery, a realtor of Bossier City, to make an appraisal or valuation of the property on behalf of Mullins. Montgomery placed a value on the property within a range of $25,000 to $40,000 after a somewhat hurried appraisal, depending upon the amount of usable land available.
This appraisal information was provided to defendant, Page, and he made an initial offer of $25,000 to purchase the property which was rejected by plaintiff Page subsequently offered $27,500 which offer was accepted by the plaintiff.
*67 On September 28, 1979, plaintiff conveyed the subject property to defendant by a credit sale deed. The deed recited that the sale was made for the consideration of the sum of $27,500. Of this amount, $2,000 in cash was to be paid and a note was executed by defendant to the order of future holder in the amount of $25,500. The note was payable in consecutive monthly installments of $229.50 each until paid in full (approximately a twenty-year period) and was to bear a nine percent interest rate. The deed further stated that "[v]endor agrees that he will execute a subordination of this mortgage to any mortgage which may be executed by vendee covering the herein described property." A correction deed was executed on November 12, 1980, containing a more detailed property description of the property conveyed to defendant.
The evidence established that although the deed recited $2,000 was to be paid in cash to plaintiff as a down payment, this amount was substantially reduced by defendant's retention of a six percent realtor's fee on the sale price in the amount of $1,650. The cash amount received by plaintiff was further reduced when the 1979 taxes due on the property were prorated between the parties.
It was established that at the time of sale, the city of Shreveport was undertaking a drainage project on the property to alleviate flooding problems in the surrounding neighborhood. The City Council passed Resolution 862 of 1976 on December 14, 1976 authorizing the engineering firm of Aillet, Fenner, Jolly & McClelland to prepare construction plans, specifications, and contract documents for the "North Highland Area Drainage Project." The council passed Ordinance No. 269 of 1977 on December 13, 1977, establishing the 1978 Federal Revenue Sharing Capital Budget which allocated $180,000 to the North Highlands/Empire Circle drainage project. This ordinance was advertised in the Shreveport Journal on December 17, 1977. A preliminary survey of the subject property was made by Aillet, Fenner, Jolly & McClelland around August 21, 1978.
Insofar as it affected the subject property, the project basically consisted of removing the pond and constructing a concrete drainage ditch.
The evidence is unclear as to the actual date the construction on the drainage project was commenced. It appears that work was begun sometime in 1979 and the project was completed in October 1982. Work on the project seems to have been intermittent. Defendant's testimony indicates that the earthen dam was not "cut" in order to drain the pond until sometime in 1980.
The drainage ditch was generally constructed in the central portion of the property and essentially divides the subject tract in two with approximately 1.6 acres located southeasterly of the ditch and approximately 1.05 acres located on the northwesterly side of the ditch. The drainage easement contains approximately 15,258.1 square feet.[1]
On February 10, 1981, plaintiff filed suit to rescind the sale of the property on the grounds of lesion beyond moiety. Plaintiff, Dodge Mullins, was later interdicted in March 1982 and Hugh Sneed was appointed as his curator. Sneed's son is married to Barbara Sneed, a niece of the plaintiff, Mullins. Sneed was substituted as the proper plaintiff in this suit prior to the trial of this matter.
A lengthy trial on the merits was held in which both parties produced expert testimony as to the market value of the subject tract at the time of the sale.
James Young and Thomas Dupree of Waguespack, Dupree and Felts, Inc., testified on behalf of the plaintiff. The value of the property was analyzed by them by the comparison of the subject site with the sales of six comparable sites that occurred in the area in recent years. In the opinion of these appraisers, the highest and best use of the subject tract was commercial with an alternate residential use such as *68 townhouse or multi-family development. The appraisers ascertained the value of the subject property under two premises. Premise one took into consideration the public drainage project and premise two was without regard to the construction project.
The comparable sites used in the appraisal are as follows:
Comparable 1This site is located in southeast Shreveport on Fant Parkway and was purchased for townhouse development on June 2, 1980. The zoning was R-1 and the sale price of the property was $120,000. The sale was adjusted downward due to a smaller site size (smaller sites generally sell for a higher per unit basis), shape, and location, but was adjusted upward for zoning.
Comparable 2This site is also located in southeast Shreveport and is being utilized for residential townhouse units. The property consists of two tracts of land on a corner location at East Kings Highway and Dixie Garden Road. Only the larger tract was utilized in the analysis and the sales price for that particular tract was $45,000. The sale was executed on August 28, 1980. The site adjoins Old River Bayou with the property sloping relatively fast to the water's edge. The sale was adjusted downward due to location and smaller site size but adjusted upward for zoning (R-1) and shape/topography.
Comparable 3This site is located at the corner of Ravendale and Dearborn approximately 1/3 mile south of the subject property. The property was purchased on August 12, 1980, for $28,000 as part of an expansion by Republic Bank which adjoins the property. The property has an R-1 zoning and a standing pond located on it. The unit value was adjusted downward due to the purchase for expansion and smaller site size but adjusted upwards for inferior zoning, shape/topography and location.
Comparable 4This is a dental clinic site approximately ½ mile north of the subject property at the corner of North Market Street and Poleman Road. There is a drainage ditch dividing the extreme northern portion of the property and approximately 50% of the site is not utilized due to drainage problems. The property was sold on May 21, 1980 for $10,000. The property was adjusted downward due to smaller site size and upward due to zoning (R-1), shape/topography and location.
Comparable 5This property was sold on January 16, 1979, and is located approximately 250 feet north of the subject property. The property contains an old service station building upon which a value of $10,000 was placed. The sales price of the property was $34,000 and the tract is zoned B-2. The property was adjusted downward due to smaller site size and upward because it was irregularly shaped.
Comparable 6This site is located less than ¼ mile south of the subject tract on the west side of North Market Street. The property was sold in late 1977 for $40,000 and is zoned B-2. A downward adjustment was made due to smaller site size and location and an upward adjustment was made for topography.
Under Premise 1, the appraisers estimated the value of the subject tract at $.65 per square foot for a total value of $84,942 from which a demolition cost to remove the abandoned buildings of $5,000 was subtracted. The value of the subject tract was rounded off to $80,000.
Under Premise II, the appraisers reduced the valuation for shape/topography as the tract with the pond was inferior to the concrete lined drainage ditch. Demolition costs were not extracted from this premise. A value of $.50 per square foot was placed on the property for a total value of $65,000.
In their appraisals, Young and Dupuree used a 12% annual property increase and an upward adjustment of 20% was applied in the comparable sites for zoning.
Plaintiff's experts further analyzed the sale to determine a "cash equivalent price" which was defined as:
[a] price expressed in terms of cash as distinguished from a price which is expressed *69 all or partly in terms of the face amount of the notes or other securities which cannot be sold at their face amount.
The cash price was discounted by 10% due to a low down payment and an additional 25% because of the subordination clause and lack of security. The experts felt that the 9% interest rate contained in the note was low and should have been around 12%.
Testifying on behalf of defendant was Marshall Graham of Marshall Graham and Associates, Inc. Graham also assigned a market value to the subject tract by a comparison to sales of comparable sites during recent years and felt that the highest and best use for the property was commercial.
Graham used the following comparables:
Comparable 1This site adjoins the subject tract and was purchased by defendant from plaintiff, Mullins and Barbara Sneed in February, 1979 for $50,000. There were two buildings on the property upon which defendant, Page, placed a value of $30,000. The property was adjusted downward for size and topography and upward for shape. Graham testified that this sale was used primarily for informational purposes.
Comparable 2This site is the same as Young/Dupree Comparable 6. This was adjusted downward for location, topography and size.
Comparable 3This site is the same as Young/Dupree Comparable 4. It was adjusted upward for location and downward for size, topography, and corner location.
Comparable 4This site is the same as Young/Dupree Comparable 3. It was adjusted upward for location and topography and adjusted downward for corner location, size, and motivation (expansion purchase).
Comparable 5This site is located at Pine Hill Road and Louisiana Highway 1 approximately 1.7 miles north of the subject property. The property was purchased for apartment development on May 27, 1982 for a total price of $218,986.06.
Graham did not make an adjustment for zoning on two of the comparables which were also utilized by Young/Dupree. Graham testified that no adjustment was necessitated considering the proposed use of the comparables by the purchaser and in one instance, final approval of a zoning change had been obtained before the sale of the property. Graham made adjustments for comparables at corner locations. Graham stated such an adjustment is typical for commercial property as it affords easier ingress and egress onto the parking lot.
Under Premise 1 without regard to the drainage project, Graham placed a value of $.38 per square foot on the subject tract and subtracted demolition costs of $5,200 for a total value of $44,624. Under Premise II considering the drainage project, Graham placed a value of $.41 per square foot on the subject tract which subtracting demolition costs left a total value of $48,558.
Graham did not compute a cash equivalency price but did conduct a study of interest rates in owner-financed sales in Caddo Parish during 1979. Graham concluded that the average rate was 8.64%.
In his written reasons for judgment, the trial judge thoroughly reviewed the evidence and rejected the contention of the plaintiff that a buyer and seller of this property would or should have knowledge of the drainage project or would have increased the sales price had they known of it. The court found the project was too speculative to have been considered by a reasonable buyer or seller even if they had knowledge of it.
In reviewing the expert testimony for both parties the court rejected the following comparables:
Young 1 and 2The court found that these sites were located too far away from the subject property and were purchased for multi-family residential, rather than commercial use.

*70 Young 5This property contained improvements which the court felt contributed to the value of the property. The court used unimproved property as comparables.
Graham 1This was also improved property which had been recently purchased by the defendant from the plaintiff and others.
Graham 5The court rejected this comparable as its highest and best use was not comparable to the subject tract.
The court took the three comparables used by both Young/Dupree and Graham and made the following adjustments.
(1) The court disregarded the 20% adjustments made by Young/Dupree for zoning. The court accepted the explanation of Graham as to why no zoning adjustments were necessary.
(2) The court accepted Graham's explanation as to why two of the comparables which were located on corners required an adjustment and accordingly adjusted the Young/Dupree figures by 10%.
After making the above adjustments and accepting all the other adjustments used by the appraisers, the court averaged the results obtained and arrived at the following per square foot value for the three comparables:
(1) Young/Dupree 3 and Graham 440.90 cents per square foot.
(2) Young/Dupree 4 and Graham 330.30 cents per square foot.
(3) Young/Dupree 6 and Graham 244.50 cents per square foot.
The court averaged these figures, multiplied by the largest square footage of the subject property used by any appraiser (131,116 square feet) and obtained a figure of $50,567. From this amount $5,000 in demolition costs was subtracted and the figure was rounded off to the nearest $500, resulting in a total market value at the time of the sale of $45,500.
In examining the terms of the sale in order to ascertain whether the price paid by the defendant was less than one-half of the value of the property, the court held that a 9% interest rate was an acceptable rate of interest in an owner financed transaction at the time of this sale. The court further held that although the amount of defendant's down payment may have been low, it did not substantially affect the price received by plaintiff as Mullins got a larger note and larger monthly payment.
In examining the subordination clause, the court recognized that the unusual clause affected the security of the note as well as its value and marketability. The court rejected plaintiff's estimate that the value of the note was reduced by 25% due to the inclusion of this clause, but rather found that the reduction in value depended on the net worth of the maker, Page. The evidence at trial established that defendant had substantial net worth at the time of the sale to date and the court found under these circumstances the value of the note had not been reduced enough to render the sale lesionary.
After reviewing the evidence, the court held that the plaintiff failed to prove that the sale was lesionary and rendered judgment in favor of the defendant.
The plaintiff asserts the following specifications of error on appeal:
A. The trial court's determination that the market value of the property at the time of the sale was $45,500 is contrary to law and the evidence;
(1) The court erred in concluding that the proposed drainage project at the time of the sale had no effect on the subject property's value.
(2) The court erred in basing its determination of value on whether the parties to the sale considered the sale to be lesionary.
(3) The court erred in basing its determination of value on an appraisal which was based on an incorrect assumption regarding the property.
(4) The court improperly disregarded the effect on value of the subject property caused by the type of zoning which applied to the subject property.
(5) The court's method of determining market value of the subject property *71 based upon averaging of the results of different comparables is improper and unjustified.
B. The trial court erred in finding that the "price given" was more than $22,750.
(1) The court erred in failing to discount defendant's note to reflect the effect of the subordination clause in the mortgage securing defendant's note.
(2) The court erred in failing to discount defendant's note to reflect the effect of the 9% interest rate which was below the market rate of interest at the time of sale.
Upon a review of the record, the judgment of the trial court is affirmed for the following reasons.
The Civil Code provides that lesion is a ground to rescind certain contracts and is limited to sales of immovable property and partitions. La.C.C. Art. 1861. Lesion is defined in La.C.C. Art. 1860 as an injury suffered by one who does not receive a full equivalent for what he gives in a commutative contract. The remedy is founded upon implied error or imposition upon the vendor for in every commutative contract equivalents are to be given and received. La.C.C. Art. 1860. See White v. Oakley, 191 So.2d 904 (La.App. 1st Cir.1966), Rogers v. Read, 355 So.2d 46 (La.App. 2d Cir.1978) and Cheramie v. St. Pierre, 382 So.2d 1003 (La.App. 1st Cir.1980) and citations therein.
In the sales of immovable property, the vendor may be relieved if the price given is less than one-half the value of the property sold. La.C.C. Art. 1861. See Alexander v. State, Dept. of Highways, 342 So.2d 1201 (La.App. 2d Cir.1977). It is the burden of the vendor in an action for rescission for lesion to prove by clear and convincing evidence that the price given was less than one-half the value of the thing sold. The standard applied to determine the value of the subject property is the fair market value at the time of the sale. La.C.C. Art. 1870, 1871, and 2590. See Goulas v. Goulas, 426 So.2d 735 (La. App. 3d Cir.1983), Bisco v. Middleton, 383 So.2d 1047 (La.App. 1st Cir.1980), Fontenot v. Fontenot, 427 So.2d 27 (La.App. 3d Cir. 1983), Dejean v. State, Dept. of Highways, 350 So.2d 938 (La.App. 2d Cir.1977), Crow v. Monsell, 200 So.2d 700 (La.App. 2d Cir. 1967), Peterson v. Herndon, 235 So.2d 178 (La.App. 2d Cir.1970), Blount v. Blount, 385 So.2d 476 (La.App. 1st Cir.1980), Succession of Jimmy Lee, 430 So.2d 1126 (La. App. 1st Cir.1983) and numerous citations therein. Market value has been defined "... in numerous cases as meaning the amount a willing purchaser would pay a willing seller for a particular piece of property." Valley Land Corporation v. Fielder, 242 So.2d 358 (La.App. 2d Cir.1970) at p. 361. The burden of proof is much more stringent in lesion cases than in expropriation cases. See Valley Land Corporation v. Fielder, supra, and Peevy v. State Dept. of Highways, 340 So.2d 642 (La.App. 2d Cir.1976).
Plaintiff contends that the trial court erred in determining that the proposed drainage project at the time of the sale had no effect on the market value of the subject property. Plaintiff essentially argues that by failing to consider the drainage project, the court incorrectly held that valuations based on the highest and best use do not apply to lesion cases and disregarded the testimony of the appraisers that the drainage project should be included in the determination of market value. In other words, the plaintiff claims that in order to correctly assess the market value of the property, the court must consider the highest and best use of the subject property which would necessarily include the planned drainage project.
There appears to be some discrepancy in the jurisprudence as to the determination of market value in lesion, as opposed to expropriation cases. In Peterson v. Herndon, supra, this court held that determination of market value by the highest and best use of the property, as in expropriation suits, is inapplicable in a suit to rescind a sale on the ground of lesion. Whereas in Fletcher v. Smith, 216 So.2d 663 (La.App. 3d Cir.1968), the court held that the determination of the market value of real estate *72 should be the same in lesion cases as it is in expropriation cases. Market value in expropriation cases has been defined as the "... price which a willing and informed buyer would pay a willing and informed seller in usual circumstances in the light of the highest and best use to which the property may be put in the not too distant future." State, Department of Highways v. Cartlidge, 258 So.2d 175 at p. 176 (La.App. 2d Cir.1972).
An examination of the jurisprudence reveals that there is no such restricting rule on the application of highest and best use in determining property market value in a suit for lesion. Rather, the plaintiff in a lesion suit may present proof of the highest and best use of the property rather than solely the actual use of the property at the time of the sale. Such proof may be considered along with all the other evidence of property value provided that it tends to show the value of the property at the time of the sale. See Peevy v. State Dept. of Highways, supra, Martin v. Mays, 127 So.2d 77 (La.App. 1st Cir. 1961), Fontenot v. Fontenot, supra, and Valley Land Corporation v. Fielder, supra, and numerous citations therein.
It is clear that there is a fundamental difference between expropriation and lesion cases. In expropriation, the property is essentially being "taken" from the seller whereas in lesion, there is a willing seller and buyer transacting a sale under normal and usual circumstances. Therefore, the courts are somewhat more liberal in ascertaining the market value of property in an expropriation proceeding so as to insure the seller receives adequate compensation for his property.
The court found that plaintiff failed to prove that a well informed buyer would have known of the project or would have increased the value of the property had they known of it due to the speculative nature of the project.
A review of the evidence supports the conclusion of the trial court that the parties to this sale did not have knowledge of the drainage project at the time of the transaction. The resolution, ordinance, and advertisement noted earlier merely identified a drainage project in the area. The scope and exact location of the project was not described therein nor was there any substantial activity on the project site before or at the time of the sale.
However, the actual or presumed knowledge of the parties as to the drainage project is irrelevant as the trial court found the project was too speculative to have been considered by the parties in formulating the sales price of the property. It is well-settled that speculative values may not be considered in determining the market value of a particular piece of property. See Cheramie v. St. Pierre, supra, White v. Oakley, supra, Valley Land Corporation v. Fielder, supra, Crow v. Monsell, supra, Peterson v. Herndon, supra, Fletcher v. Smith, supra, Peevy v. State Dept. of Highways, supra, and numerous citations therein.
Although the project had been funded at the time of the sale it appears that no actual construction work had commenced on the site. The drainage project took approximately three years to be completed which clearly points to its highly speculative nature at the time of the sale. The testimony of defendant's expert, Graham, supported the finding of the court that the project did not substantially contribute to the value of the property. Graham pointed to the lengthy completion of the project which would render the market for the proposed use of the property and cost of interest extremely speculatory.
The court, in not considering the drainage project, was simply rejecting the highest and best use of the property as this was found to be speculative and did not tend to show the value of the property at the time of the sale. Actual or presumed knowledge, at the time of the sale, of the drainage project becomes irrelevant in light of its speculative nature. Even though the expert appraisers considered the project in determining the market value of the property *73 (Young/Dupree Premise 1, Graham Premise II), the court was not bound to accept these values as they were based upon a speculative project and the court's own determination of value was based on sound reasoning. See Bisco v. Middleton, supra, Fontenot v. Fontenot, supra, and citations therein. In other words, in determining the market value of the property the court did not have to accept the experts' testimony as to the highest and best use of the property. The values formulated using this highest and best use were calculated upon a speculative factor and did not tend to show the value of the subject property at the time the sale was transacted. Therefore, under the jurisprudential rule noted earlier, the court was not required to consider this evidence along with the other evidence of the property's value.
It is notable that defendant's expert only increased the market value of the subject property by $4,000 when taking the drainage project into consideration.
Plaintiff next argues that the court erred in basing its determination of value on whether the parties to the sale considered the sale to be lesionary. In its opinion, the court examined the Montgomery appraisal and noted that little weight was to be given to this estimate of value. The court stated that the appraisal did illustrate that at the time of the sale both the parties thought the price being paid was not lesionary.
It is well-settled that the vendor has the right to rescind a sale for lesion even though at the time of the sale he knows that the value of the property exceeds twice the price received. La.C.C. Art. 2589. See also Rogers v. Read, supra, and citations therein.
A thorough review of the record reveals that the trial court placed no weight on the finding that the parties did not consider the sales price to be lesionary but rather founded its determination of value on other competent evidence.
Plaintiff contends that the court further erred in basing its determination of value on an appraisal which was based on an incorrect assumption concerning the property.
In testifying, defendant's expert, Graham, stated that the property had only eleven feet of frontage south of the thirty-foot drainage easement on North Market easement which virtually rendered ingress to the south end of the property impossible. Graham made a negative adjustment to accommodate the cost of a bridge necessary to gain access to the property. Plaintiff claims that Graham was incorrect as to the amount of frontage and therefore his negative adjustment based on this assumption was in error. The record reveals that plaintiff's argument is without merit.
During the course of his testimony, Graham pointed out although there was substantially more than eleven feet of property frontage on North Market, a bridge was still necessitated for commercial development to obtain optimum use of the property as the drainage ditch essentially divided the property in two and severely restricted full access to the property. A bridge crossing over the easement would greatly enhance accessibility from one portion of the property to the other which would be necessary to fully develop the property.
Plaintiff next argues that the court improperly disregarded the effect on the value of the subject property caused by the type of zoning which applied to the subject property.
In several of the common comparables used by the court, Young/Dupree had applied a 20% adjustment for zoning. In its opinion, the court stated that it disregarded these adjustments and accepted the explanation of defendant's expert as to why no zoning adjustment was necessary.
Young testified that in several of the original comparables, the sales were predicated upon rezoning and the adjustment was made in part to take into account the process of obtaining rezoning by the purchaser. Graham testified that he made no such adjustment considering the proposed use of the comparable and in one instance, *74 final approval for the zoning change had been obtained prior to the sale.
The court was not in error in rejecting the zoning adjustment. There was not sufficient evidence in the record as to rezoning expenses or as to inferiority of one zoning classification as opposed to another to substantiate a 20% adjustment.
Plaintiff contends that the court's method of determining market value of the subject property based upon averaging of the results of different comparables is improper and unjustified and cites State, Department of Highways v. Munson, 174 So.2d 923 (La.App. 1st Cir.1965) in support of this position.
In State, Department of Highways v. Munson, supra, the court held that "... averaging of opinions, though very convenient and probably sound in a case where there is very little difference between the opinions of the various experts, cannot be resorted to to reconcile greatly divergent estimates. To do so would encourage gross exaggerations on both sides and produce wholly unreliable expert testimony." at p. 924.
The record is clear that the trial court, in making its calculations of value, clearly did not average the appraisals or opinions of the experts. Rather, the court carefully considered each appraisal, rejecting several comparables used by each appraiser. The court rejected some of the adjustments made on the remaining comparables and then utilized the remaining comparables and adjustments to formulate a market value. As the remaining comparables in each appraisal were the same three parcels of property, it is clear that the only thing the trial court averaged were some of the adjustments made by the appraisers on the same comparable sales.
The court in its opinion denying plaintiff's motion for a new trial stated that it found all of the experts to be highly competent appraisers and the court was not inclined to reject adjustments adequately explained by each appraiser, even though they were different.
The reason behind the rule prohibiting the averaging of appraisals is clear. If averaging was permitted, the parties to a suit would produce extremely exaggerated and highly divergent estimates of value to insure they would be protected. The trial court, in this instance, has not violated this rule. Adjustments, rather than appraisals, were averaged. By averaging these adjustments, the court merely gave equal weight to specific adjustments made by the appraisers.
Plaintiff argues that the trial court erred in determining the price given for the property was more than $22,750 by failing to discount defendant's note to reflect the effect of the subordination clause in the mortgage securing the note and to reflect the 9% interest rate which was below the market rate of interest at the time of the sale.
In determining whether a sale is lesionary, the court must examine the price given in terms of the usual credit given on sales of property of that description. When there is a variance from the usual credit terms, the credit price may be adjusted accordingly. La.C.C. Art. 1870. See also Parker v. Rhodes, 260 So.2d 706 (La. App. 2d Cir.1971).
At trial, plaintiff produced evidence as to the unusual nature of the subordination clause included in the mortgage which thereby reduced the value of the defendant's note. Plaintiffs' appraisers used a 25% adjustment in value to reflect the effect of the clause when computing the cash equivalency of the price given. Defendant's appraiser testified that the reduction in value necessarily depended upon the net worth of the maker. Graham stated the note would be reduced in value by approximately $500, the cost of obtaining a letter of credit from defendant bank.
The trial court recognized that the clause did affect the value of the note but the reduction in value was not enough so as to render the sale lesionary.
The court noted that the evidence at trial showed the defendant-maker of the note to *75 be of substantial net worth at the time of the sale. The court found that the 25% reduction figure used by plaintiff was not adequately supported.
In light of this evidence, it is the opinion of this court that the trial court did not err by failing to discount the value of the note by 25%. There was simply no evidence to support the seemingly arbitrary assignment of a figure of 25% by the expert. Rather, the evidence showed the maker to have substantial net worth at the time of sale to date which would act to offset any lack of security of the note caused by the subordination clause.
Although the court assigned no figure to the amount the note was reduced in value due to the inclusion of the clause, it concluded that the reduction was not sufficient to render the sale subject to rescission on the ground of lesion. The evidence in the record fully supports this conclusion.
Plaintiff argues that the price given must also be discounted to reflect the effect of the 9% interest rate which was below the market rate of interest at the time of the sale. Plaintiff's appraiser, Dupree, testified that considering the prime rate at the time of the sale, the correct interest rate should have been 12%. As noted earlier, defendant's appraiser conducted a study of interest rates in owner-financed sales in Caddo Parish during 1979. He found the average rate of interest was 8.64%.
The record supports the court's finding that 9%, as opposed to 12%, was a fair rate of interest at the time of the sale as substantiated by the Graham study and the court did not err in failing to discount the value of the note.
For these reasons, the judgment of the court in favor of defendant, James Franklin Page, and against plaintiff, Hugh Sneed, in his capacity as curator for Dodge E. Mullins, is affirmed at plaintiff's costs.
AFFIRMED.
NOTES
[1] This description of the subject property is contained in the report of plaintiff's appraisers.