11 CARAWAY, Judge.
In this case, a disputed sale of a large tract of timberland was held by the trial court to be in violation of Louisiana’s lesion principles. Soon after the initial sale, a second sale of the property was made to a large timber company for over two and one-half times the first purchase price. This dispute therefore requires a determination of the “fair market value” of the property under La. Civ.Code art. 2589.[1] Finding that the trial court misapplied the high legal standard for setting aside as lesionary a transaction involving timber as the principal market value component for the land, we reverse the trial court and dismiss the lesion claim.

Facts and Trial Court Ruling

In late September, 1994, the defendants, James Mixon and Floyd Smith, entered a contract for the purchase of a 160-acre tract of timberland in Winn Parish from Mary Alice Barber Cook for $84,215. Approximately six weeks later and after the parties’ sale had been consummated, the defendants, in an effort to resell the property, solicited and received bids from other potential timberland purchasers, including Williamette Industries, an adjoining landowner, which had the timber cruised and the property appraised in early November. After receiving Williamette’s $192,180 bid on the tract — $60,-000 more than the next highest bid — Smith contacted Williamette to assure the accuracy of the bid and was informed that Williamette was upping its bid to $225,934. Defendants quickly accepted Williamette’s bid, and the property was deeded in January, 1995.
After becoming aware of Williamette’s purchase price, the plaintiff, Mrs. Cook, brought this action pursuant to La. Civ.Code art. 2594 to recover the profit which defendants realized from their sale to Williamette. Plaintiffs primary ^witness was Steve Barham, Williamette’s manager of the Dodson Forestry and Logging Division, who had recommended to his management the initial $192,-180 bid for the property after reviewing a Williamette estimate of the volumes of marketable timber on the land. Plaintiff attempted to support the Williamette appraisal of the property through the testimony of a real estate appraiser, Randy LaCaze. However, LaCaze, who viewed the property after Williamette had clear-cut the timber, gave no opinion of the disputed timber value based upon his determination of the quantity of timber and timber prices existing in the fall of 1994.
The defendants presented evidence from various sources indicating that at the time of the September, 1994 contract to sell,[2] the land with the standing timber was worth no more than $133,000, which was much less than the $168,500 lesionary threshold. Defendants’ evidence included four timber cruises of the property made by foresters for different companies conducted at various times between January, 1994 and late October, 1994. There was a difference of 94,000 board feet of pine saw logs between William-ette’s cruise obtained by Barham and the next.highest estimate obtained by Greg Wil-banks. Significantly, Wilbanks, a real estate appraiser, prepared his appraisal in October before this controversy and submitted it as his opinion to a bank which was loaning money to Mixon for the purchase. Wilbanks, who reported a $123,500 appraisal, found the value of the raw land to be $285 per acre based upon comparable sales of other cut-over timber tracts in Winn Parish. He valued the timber after obtaining a cruise by a forester and determining current prices from timber processors in the area.
*1266 The undisputed evidence, which Wilbanks and the other witnesses presented, showed that the price for pine saw logs during the last quarter of 1994 |3was increasing at a rapid rate of 33%, from $300/mbf in late September when the parties entered their contract, to $330/mbf in November at the time of Williamette’s bid, and finally, to $400/ mbf or more in January, 1995, when William-ette’s purchase was complete.
In ruling that lesion applied/ the trial judge rested his decision primarily on the fact of the actual sale to Williamette, as seen in the following excerpts from his oral reasons for ruling:
We are not talking here in the abstract about ... we are not talking, for example like an expropriation where one appraiser says the land is worth ... and another appraiser says the land is worth that and the court has to decide how much the state is going to have to pay to expro ... This is really valuing the abstract. That is not what the ease is here because in this case it is different because the testimony of Mr. LaCaze is supported by what really happened. The' difference in this case is that Williamette ... * * * The difference is that Williamette paid over two hundred and twenty five thousand dollars. Now, that backs up certainly the testimony of Mr. LaCaze as to what this property was worth. * * * What actually somebody pays is hard to dispute that it is not worth what somebody pays. That is the biggest factor, I think, that it was actually done. * * * * * *
Now, there is evidence to indicate that it would have been a bad buy perhaps for anybody else to pay two hundred and twenty five thousand dollars or even a hundred and ninety two, the original offer. But, market is not determined by what somebody else couldn’t make any money on. Market is determined by what it will bring. We can’t take that company out. We can’t take Williamette out and say we have to determine value based upon everybody except Williamette. * * * Maybe somebody that is not adjoining would not be willing to pay as much. Obviously, that is what the case just about proved. But, they are adjoining and they are there and they were buying property and they did pay it. I can’t envision any greater test of value than what actually happens.

Discussion

In the context of lesion and other settings, fair market value is consistently defined as the amount a willing and informed buyer would pay a willing and informed seller for a particular piece of property, with neither being under any compulsion to buy or sell. See, for example, Mullins v. Page, 457 So.2d 64 (La.App. 2d Cir.1984), writ denied, 459 So.2d 538 (La.1984); La. R.S. 47:2321 and Treas. Regs. § 20.2031-1(b). A market brings together buyers and sellers who arrive, through their collective force, upon price or fair value.
The trial court’s singular focus erroneously made Williamette the market, dismissing from consideration the collective expression of fair value reported by the other witnesses. Despite Williamette’s willingness to pay an excessive price and its actual purchase, the market was still required to be measured by the trial court “in the abstract” in terms of what other willing and informed buyers would pay in order to realize an economic benefit or obtain “fair value” from the property. The above ruling of the trial court demonstrates an error of law in that he rejected as “abstract” the undisputed evidence of what other market participants would have paid and the evidence of the quantity of the harvestable timber which overwhelmingly demonstrated that William-ette made a “bad buy.”
Historically, our law has maintained a firm policy rejecting lesion as a market impediment in the sale of movables, limiting the doctrine to immovables only. La. Civ.Code art. 2589. Though this land with its component part, the timber, was a single immovable at the time of the sale and therefore subject to lesion, the appraisal method and market applicable for the harvestable timber are basically the same as employed for movables where protection against lesion is unnecessary. The law does not protect the owner of harvested timber, who presumably can *1267 determine the quantity and quality of the product and transport it to a current market for processing, where other sellers also are continuously realizing the going price for similar timber and pulp.
In contrast, the more difficult appraisal of land, for which the law affords the seller protection, must involve a review of other land sales, usually more distant-in time from the current sale, with somewhat dissimilar characteristics as to |sthe property and its locality. The appraiser of land reviews prior sales of distinguishable, yet comparable tracts and makes adjustments for the analysis of the subject tract. The appraiser of harvestable timber is dealing more with a commodity of a fungible nature, which, by definition, is more definitely and conveniently measured and priced.
With this distinction between the appraisal processes for the land and the timber, the trial of this case nevertheless involved no controversy over the appraisals for the raw land since clear-cut tracts in nearby rural locations demonstrated a consistent market price in the range of $250-$300 per acre. The trial court’s choice of $250 per acre or $40,000 for this land (absent the timber value) has not caused this lesion controversy.
This controversy centered instead on the evaluations for the timber component for this tract. These estimated values varied in the extreme with the primary dispute arising from the disparate assessments of the quantity of the harvestable timber. What was the plaintiffs burden of proof to demonstrate an accurate measure of the quantity of timber and to determine the fair market value of what, in essence, was the commodity element of the value of this tract? The jurisprudence of our highest court holds that before the free commerce between the parties can be thwarted by lesion, the evidentiary burden requires “practical certainty” for the timber value of this land.
The leading case, Smith v. Huie-Hodge Lumber Co., 129 La. 28, 55 So. 698 (1911), arose at a time shortly after the passage of Act No. 188 of 1904 which had made standing timber sold to another by the landowner an immovable. See, La. Civ.Code art. 464. Lesion, therefore, had become clearly applicable to the sale of standing timber, contrary to the court’s view of the prior Louisiana law and to French law. The court gave the following insight into why lesion claims in a |6timber sale setting should require'“unquestionable proof’ of the quantity and price of timber:
A lesion suit, at best, when unaccompanied, as in the present case, by any suspicion of actual fraud, does not recommend itself to a court of justice. It calls upon the court to set aside a contract to which parties fully capable of contracting, and not alleging any actual error or fraud, have deliberately consented. The law does not countenance such a suit when the property sold is a movable. “The reason,” says Troplong, Com. of article 1674, C.N., “is that the price of movables is less constant than that of immovables.... ”
It would be impossible to find a point of comparison positive enough to establish the ruling price at the moment of the contract. “For that reason,” says the ■learned author, “rescission is not admitted in the sales of timber.” Under stress of a legislative act whereby, with no thought to suits like the present, standing timber has been made to retain its character of immovability, after sale, this court has had to recognize that the sale of timber may furnish ground for an action of lesion; but the same reason which, before the passage of said legislative act, would have defeated an action in such a ease, continues to apply to this extent, that it will make the courts all the more careful and exacting in requiring full, complete, and unquestionable proof of the lesion.
Id., 129 La. at 35, 55 So. 698.
While the reasons for volatility in the pricing of timber referred to in the quoted commentary of Troplong and discussed in other portions of the opinion in Smith are apparently not the same in this day of modern transportation and available processing facilities for timber, the critical factor wrestled with in Smith, as in this case, concerned the determination of the volume of the harvesta-ble timber. Though everyone examined the same forest, the plaintiffs experts in Smith *1268 (which, like Williamette’s appraiser, .Mr. Bar-ham, had some obvious bias) estimated a high volume of timber in comparison to the timber cruise of the defendants’ experts. The trial court accepted the plaintiffs estimates, and the supreme court reversed, even after assuming no bias on the part of the plaintiffs witnesses. The court ruled:
As to the quantity of the timber, assuming that the interest which Mr. Williams and plaintiffs son had in the result of the suit, |7with a view to which the estimates were made by them, in no way warped the judgment of the estimators in guessing at the diameter of the trees as they counted them or in determining whether they were merchantable or not, and in no way influenced their action in selecting the particular trees whose average contents should serve as the multiplicand or multiplier for calculating the contents of the trees upon the land, and in guessing the height of these trees, there still remains a wide margin for uncertainty; and in a case of this kind, where the deliberate contract of parties devoid of all fraud is to be set aside, there ought to be certainty, or practical certainty.
Id., 129 La. at 38, 55 So. 698 (emphasis supplied). (The companion case with the Smith case, Rogers v. Huie-Hodge Lumber Co., 129 La. 40, 55 So. 702 (1911), applied the same rationale to a sale of land with standing timber, such as the subject sale in this dispute.)
Smith’s stern test[3] of “practical certainty” for the “appraisal” of the quantity of timber is a recognition that such appraisals involve merely counting, the counting of a finite number of trees. Unlike the subjective inferences that must be drawn and interpreted by the experts from comparable land sales in order to appraise the land, the essential task of the appraisers of the timber in Smith and in this ease involved the objective craft of counting. In Smith, timber cruises over sample areas of the tract and the estimated counts of timber from those cruises resulted in the ruling against the plaintiff in the lesion action where more accurate proof by an actual count could have established “practical certainty.”
In the instant case, the evidence of the five cruises of the timber reveals a difference of 94,000 board feet of pine saw logs between the Williamette timber cruise[4] and the defendants’ highest estimate from the other cruises. Other than the pine saw logs, the differences between the Williamette cruise and the other four |8cruises regarding the estimated amount of pine pulp and hardwood are not significant enough to tip the lesionary scale. This huge difference in the estimated pine saw log volumes, when priced at the established price of $300/mbf, amounts to $28,200. This is more than enough to reduce Mr. Barham’s $192,180 bid[5] which was based upon the Williamette cruise to an amount less. than the $168,000 lesionary threshold.
With the Smith test for practical certainty, the best evidence of the timber quantities which was established before trial resulted from Williamette’s actual harvesting of the timber by the clear-cutting of the property in 1995. On cross-examination, Mr. Barham testified that he had seen and reviewed the actual amounts of the various volumes harvested from the property but could not recall those amounts at the time of trial.
Even in the absence of Smith’s heightened evidentiary burden upon this *1269 plaintiff to show with practical certainty the specific amount of timber on this property, the general rule is that the failure of a litigant to produce evidence within his reach raises the presumption that the evidence would have been detrimental to his case. Johnson v. Department of Public Safety; 627 So.2d 732 (La.App. 2d Cir.1993). Plaintiffs suggestion in argument against a motion for new trial that defendants should have discovered the actual amount of the harvested timber before trial is a distortion of the high burden of proof in this lesion action.
Moreover, there clearly was a cloud of suspicion, speculation and bias surrounding Mr. Barham’s testimony and Williamette’s bid. At the time of Williamette’s bid, the property was landlocked with an expanse of Williamette’s land extending on three sides of the 160-acre’ quarter section. Though Williamette | gwould not admit to any subjective compulsion to acquire this missing piece of its timberland domain, its management’s unexplained $35,000 raise of its initial high bid indicates that Williamette wanted this land badly for reasons extending beyond fair market value. In Mayard v. Laporte, 109 La. 101, 33 So. 98, 100 (1902), the court expressly refused consideration of an extremely high price later paid by an adjoining owner for a portion of the disputed lot which was claimed to have been sold months earlier in violation of the lesion principle. Even though the second sale involved the very tract whose market value was in dispute, that sale to the adjoining owner was ruled an “exceptional transaction” that was “dictated more by the special need of the purchaser” and therefore not indicative of fair market value.
Additionally, the testimony showed that the prevailing price for pine saw logs during the last quarter of 1994 was increasing rapidly. A breakdown of Barham’s appraisal for the harvestable timber, even after accepting his high estimates for the volumes of the pine and hardwood, reveals that his $143,205 value for the timber was based upon prices which were 20% higher than the late-September prices,[6] and even higher than the prevailing November prices as established at trial.
291 mbf - pine saw logs @ $300/mbf = $ 87,300
65 mbf - hardwood logs @ $250/mbf = $ 16,250
300 cords - pine pulp @ $25/cord = $ 7,500
575 cords - hardwood pulp @ $14/cord = $ 8,050
Total = $119,100
Williamette’s view of the timber prices must therefore be seen as excessively speculative. The late-September prices must determine whether this sale was lesionary, and the trial court’s acceptance of Williamette’s mid-November appraisal employing prices 20% higher than the prices at the time of the late-September contract between the parties is clear error. La. Civ.Code art. 2590. Indeed, in September, another national timber company, Stone Container, declined | ipto exercise its right of first.refusal to meet the defendants’ $84,000 price for the property. Stone’s foresters had managed the property for the plaintiff in the months immediately preceding this disputed sale under a contractual arrangement which provided Stone with option rights in the property. The detailed maps of the topography and areas of timber growth, which Stone had provided to the plaintiff in rendering its forestry services, placed Stone in the best position to evaluate the property. Yet, Stone declined to acquire for $84,000, a tract which Williamette valued at $225,000.
Finally, Mr. Barham’s $192,180 appraisal, upon which his company “heavily” relied, was $60,000 more than the next highest bid presented to the defendants. Moreover, he did not object to his upper management’s unexplained raising of the bid to $225,000. If he could not justify his high estimate for the value of timber on the property and if Williamette truly had no special desire to acquire this ádjoining 160-acre tract, his company would have been shown to have suffered a loss as the result of his management decisions. This bias cannot be ignored.
*1270 In summary, the cloud overhanging Wil-liamette’s extremely high price cannot be dismissed when the bids of the rest of the market participants exhibited unquestioned accuracy and collectively centered around a fair value of approximately $125,000, which was $100,000 less than the price paid by Williamette. The trial court’s emphasis that Williamette cannot be excluded from the “market” analysis for this property ignores the concept of “fair value.” For our law to provide relief under the policy for lesion in a setting closely akin to the sale of movable property which can be counted and priced to determine fair value, the plaintiff was required to establish that Williamette’s extremely high estimate of the volume and price for the timber was accurate. The plaintiffs evidence failed to | nmeet that test with practical certainty. Williamette’s high appraisal and actual purchase were not indicative of fair market value.

Conclusion

The judgment of the trial court granting the plaintiffs claim of lesion is reversed and the case is dismissed. Costs are assessed to the plaintiff.
REVERSED.
STEWART, J., dissents and assigns written reasons.
HIGHTOWER, J., dissents for the reasons set forth by STEWART, J.

. La. Civ.Code art. 2589 provides in pertinent part:
The sale of an immovable may be rescinded for lesion when the price is less than one half of the fair market value of the immovable.

. The trial court followed La. Civ.Code art. 2590 and ruled that the September 29, j 994 date of the parties' contract to sell was the critical evaluation date for the property.

.. The high burden of proof imposed by Smith is also reflected in the jurisprudence regarding lesion claims in settings other than timber sales. For example, in a more recent ruling, this court has required the burden of "clear and convincing evidence” and has noted that the “burden of proof is much more stringent in lesion cases than in expropriation cases.” Mullins v. Page, supra at 71.

. With plaintiff's high burden of proof, it is significant that the person who actually performed the timber cruise for Williamette did not testify. The cruise covered only 10% of the tract. Mr. Barham used the timber volume estimate from that cruise in preparing his $192,180 bid.

. Inexplicably, after Mr. Barham’s $192,180 bid was submitted to defendants on behalf of Wil-liamette, Williamette upped its bid $34,754 to $225,934. No "market value” justification was given at trial for the added value, and Mr. Bar-ham offered no specific reason for his company’s decision.

. Using the late-September prices established at trial, Mr. Barham’s volumes would result in the following value for the timber instead of the $143,205 value which he employed: